# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| KIMETRA BRICE, EARL BROWNE, and JILL NOVOROT, | § § § | |
| *Plaintiffs*, | § § | Misc. No. 3:21-mc-00023 |
| v. | § § § | (Relates to Case No. 3:18-cv-1200-WHO, in the United States District Court, Northern District of California) |
| HAYNES INVESTMENTS, LLC, and L. STEVEN HAYNES, | § § § | |
| *Defendants*. | § | |

## APPENDIX IN SUPPORT OF
## HAYNES INVESTMENTS, LLC, AND L. STEVEN HAYNES'S
## <u>MOTION FOR PROTECTION</u>

| Ex. No. | Document Description | App. Page |
|---|---|---|
| 1 | Class Action Complaint and Demand for Jury Trial, dated February 23, 2018, in Case No. 3:18-cv-1200-WHO, *Kimetra Brice et al. v. Haynes Investments, LLC, et al.*, pending in the United States District Court for the Northern District of California ("<u>California Lawsuit</u>"). | 001 – 038 |
| 2 | Notice of Deposition of L. Stephen Haynes, dated February 2, 2021, in the California Lawsuit. | 039 - 041 |
| 3 | Amended Notice of 30(b)(6) Deposition of Haynes Investments, LLC, dated February 2, 2021, in the California Lawsuit. | 042 - 052 |
| 4 | Plaintiff's Second Amended Petition, dated April 6, 2020, in Cause No. DC-19-13904, *Think Finance, LLC v. L. Steven Haynes, et al.*, pending in the 160th Judicial District Court of Dallas County, Texas (the "<u>Texas State Court Lawsuit</u>"). | 053 - 088 |
| 5 | Deposition Transcript of L. Steven Haynes, Individually, and as the Corporate Representative of Haynes Investments, dated February 12, 2021, in the California Lawsuit. | 089 - 096 |

| Ex. No. | Document Description | App. Page |
|---------|---------------------|-----------|
| 6 | Order Granting Joint Motion to Abate Proceeding Pending Settlement, dated August 26, 2020, in the Texas State Court Lawsuit. | 097 - 100 |
| 7 | Declaration of L. Steven Haynes in Support of Motion for Protection, dated March 4, 2021. | 101 - 102 |
| 8 | Email correspondence between Defendants' Counsel and Plaintiffs' Counsel in the California Lawsuit. | 103 - 106 |
| 9 | Email correspondence from court reporter and Defendants' Counsel in the California Lawsuit, dated February 17, 2021. | 107 |

Dated: March 4, 2021.

Respectfully submitted,

By: */s/ David A. Walton*
David A. Walton
Texas Bar No. 24042120
dwalton@bellnunnally.com
Bell Nunnally & Martin LLP
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
Tel. (214) 740-1445
Fax (214) 740-5745

*Counsel for Defendants,*
*Haynes Investments and L. Steven Haynes*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was sent to the following parties of record in accordance with the Federal Rules of Civil Procedure on March 4, 2021.

Anna C. Haac
ahaac@tzlegal.com
Tycko & Zavareei LLP
1828 L Street, NW, Suite 1000
Washington, DC 20036
Tel. 202-973-0900, ext. 105
Fax 202-973-0950

*Counsel for Plaintiffs, Kimetra Brice, Earl Browne, and Jill Novorot*

David F. Herman
dherman@armstrongteasdale.com
Jonathan P. Boughrum
jboughrum@armstrongteasdale.com
Michael C. Witsch
mwitsch@armstrongteasdale.com
Armstrong, Teasdale, LLP
2005 Market Street, 29th floor
One Commerce Square
Philadelphia, PA 19103
Tel. 267-780-2015

*Counsel for Defendants in the California Lawsuit*

Tanya S. Koshy
tkoshy@tzlegal.com
Tycko & Zavareei LLP
1970 Broadway, Suite 1070
Oakland, CA 94612
Tel. 510-254-6808
Fax 202-973-0950

*Counsel for Plaintiffs, Kimetra Brice, Earl Browne, and Jill Novorot*

By:  /s/ David A. Walton
David A. Walton

Craig C. Marchiando (SBN 283829)
Leonard A. Bennett, *pro hac vice forthcoming*
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel: (757) 930-3660
Fax: (757) 257-3450
craig@clalegal.com
lenbennett@clalegal.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHER DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **KIMETRA BRICE, EARL BROWNE, and JILL NOVOROT,** | : | Case No. _____ |
| | : | |
| **Plaintiffs,** | : | **CLASS ACTION COMPLAINT AND** |
| | : | **DEMAND FOR JURY TRIAL** |
| **v.** | : | |
| | : | |
| **KENNETH REES, GPL SERVICING, LTD., PLAIN GREEN, LLC, GREAT PLAINS LENDING, LLC, VICTORY PARK CAPITAL ADVISORS, LLC, VICTORY PARK MANAGEMENT, LLC, SCOTT ZEMNICK, JEFFREY SCHNEIDER, THOMAS WELCH, HAYNES INVESTMENTS, LLC, and L. STEPHEN HAYNES,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

Plaintiffs, Kimetra Brice, Earl Browne, and Jill Novorot (collectively "Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by Counsel, and for their Class Action Complaint against Defendants Kenneth Rees, GPL Servicing, Ltd., Plain Green, LLC, Great Plains Lending, LLC, Victory Park Capital Advisors, LLC, Victory Park Management, LLC, Scott Zemnick, Jeffrey Schneider, Thomas Welch, Haynes Investments, LLC ("Haynes Investments"), and L. Stephen Haynes (collectively "Defendants"), they allege as follows:

DEFENDANT'S
EXHIBIT

**1**

# I.  PRELIMINARY STATEMENT.

1.      Most states have enacted usury laws that limit the amount of interest that a company may charge on a loan. To evade these laws, payday lenders originated their loan products in the name of national banks, who were exempt from state interest-rate caps under the National Bank Act. *See* 12 U.S.C. § 85. Under these arrangements, the bank served as a conduit for the loans in exchange for a fee, but the payday lender funded, serviced, and collected the loans—a tactic known as "rent-a-bank." When federal regulators began cracking down on these rent-a-bank arrangements, the payday lenders developed a solution—they adapted the structure to use Native American tribal entities as the conduit to ostensibly cloak the loans in tribal sovereign immunity.[1] Hence, the new structure has been dubbed "rent-a-tribe" lending.

2.      This case involves a rent-a-tribe enterprise that was established with the intent of evading state usury laws. Prior to establishing the rent-a-tribe enterprise at issue, Defendant Kenneth Rees ("Rees") and his company, Think Finance, LLC,[2] made millions of dollars through a rent-a-bank relationship with First Bank of Delaware. After federal regulators shut down the rent-a-bank arrangement, Think Finance, under the direction of Rees, established a rent-a-tribe lending scheme with the Chippewa Cree Tribe and Otoe-Missouria Tribe. Under the rent-a-tribe model, loans were made in the name of Defendants Plain Green, LLC and Great Plains Lending, LLC— two entities formed under tribal law to serve as the fronts to disguise Defendants' roles and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of their

---

[1] *See, e.g.,* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 785 (2012) (providing background on payday loans and describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance").

[2] Various lawsuits and government enforcement actions have uncovered the enterprise's misconduct. *Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139 (E.D. Pa.). Faced with mounting pressure from the lawsuits and regulatory actions, Think Finance and its subsidiaries, Think Finance SPV, LLC; TC Decision Sciences, LLC; and Tailwind Marketing, LLC filed for bankruptcy on October 27, 2017, to avoid responsibility for the illegal scheme. *Think Finance, LLC v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Bankr. Tex.).

CLASS ACTION COMPLAINT                                                    002

name, the tribal companies received a nominal flat-fee of the revenue from the loans,[3] but they otherwise had no control over the income, expenses, or day-to-day operations of the businesses.

3. Each of the Defendants played an integral role in the scheme. Rees was one of the architects of a rent-a-tribe lending enterprise—one of the few in his role yet to be criminally prosecuted for his misconduct.[4] Rees is the former president and chief executive officer of Think Finance, the company that provided the infrastructure to run the lending operation, including the software, risk management, application processing, underwriting assistance, collections, and customer service for the loans. In short, although Plain Green and Great Plains held themselves out as the actual lenders of these internet payday loans, Think Finance controlled the origination and servicing of the loans under the guise of Plain Green and Great Plains.[5]

---

[3] Although Plain Green received 4.5% of the revenue on paper, these funds were diverted to tribal leaders such as Neal Paul Rosette and Billi Anne Morsette, the former "chief executive officers" of Plain Green who were sent to prison for accepting bribes in exchange for facilitating the award of tribal contracts and for helping another tribal member siphon over $55,000 in tribal monies, which were laundered through the predecessor company of Plain Green. The United States Attorney's Office, District of Montana, *Plain Green Officials Sent to Prison* (March 8, 2016), https://www.justice.gov/usao-mt/pr/plain-green-officials-sent-prison. As part of this investigation, the Montana Attorney General's office uncovered that Rosette, Morsette, and James Eastlick, Jr., each received $400,000 from a consulting company, Ideal Consulting, LLC, involved in the Plain Green operation. *Id.* In other words, the Chippewa Cree Tribe actually received far less than the 4.5% allocated to it under the agreement.

[4] *See* Press Release, The United States Attorney's Office, Southern District of New York, Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; Press Release, The United States Attorney's Office, Eastern District of Pennsylvania, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

[5] Plaintiffs anticipate that Plain Green and Great Plains will claim to be "arm(s) of the tribe" and thus protected by tribal immunity. Although the doctrine of tribal sovereign immunity protects the tribe itself, it does not automatically extend to economic subdivisions of a tribe, and the Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citing *Gavle v. Little Six, Inc.,* 555 N.W.2d 284, 293 (Minn.1996)). In addition to the allegations alleged in this Complaint concerning the creation, purpose, and structure of Plain Green and Great Plains, these entities are not entitled to sovereign immunity because nearly all of the profits of the scheme went to non-tribal participants and the companies were established for the sole purpose of evading state usury laws. Extending the protections of tribal immunity to Plain Green and Great Plains would not serve the policies underlying tribal sovereign immunity.

4.      Defendant GPL Servicing, Ltd. ("GPLS") played an integral role in the rent-a-tribe enterprise as the special purpose company created to raise and provide the capital to fund the hundreds of millions of dollars of illegal loans made to consumers. According to Think Finance itself, GPLS was created "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See* Complaint ¶ 24, *Think Finance, LLC, v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Bankr. Tex.) (explaining the creation of GPLS). Defendant Victory Park Capital Advisors, LLC, a private equity firm, owned most of the shares of GPLS, but "Victory Park required that Think Finance purchase a portion of the equity in GPLS, which it did through Think SPV." *Id.* at ¶ 26. The enterprise also raised money from third party investors. *Id.* at ¶ 27. The enterprise used the money invested in GPLS to make the illegal loans to consumers, and in turn, investors in GPLS received an 18-20% *fixed-rate* return on their investment—which was *guaranteed* by Think Finance. Because it bore all the risk and handled the operations, the remaining profits (which were substantial) were distributed to Think Finance.

5.      Defendant Haynes Investments, LLC provided substantial capital used to make high-interest loans to consumers and participated in the affairs of the enterprise as explained below. L. Stephen Haynes is the owner and managing partner of Haynes Investments. Scott Zemnick, Jeffrey Schneider, and Thomas Welch are partners at Victory Park. Each of these individuals participated in their respective firms' decision to invest and reinvest in the enterprise. Each of these individuals also actively participated in the affairs of the enterprise and helped design the financial and operational structure of the rent-a-tribe scheme. As a result of their participation in the enterprise and direct involvement of the underlying illegal conduct, the individuals are jointly and severally liable for the claims of Plaintiffs and the class members.

6.      Because of their comfort with the rent-a-tribe structure, Defendants' scheme made loans in California with annual percentage rates in excess of 400%—more than 40 *times* the 10% interest-rate cap in Article XV of California's Constitution. CAL. CONST. Art. XV § 1. If a lender makes a loan in violation of Art. XV § 1, then "[n]o person, company, association, or corporation

4

shall directly or indirectly take or receive in money, goods, or things" and the loan is void. CAL. CIV. CODE § 1916-2.

7.    Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Defendants received millions of dollars derived from the collection of unlawful debt, and Defendants used and reinvested this income to grow the rent-a-tribe enterprise. Further, Defendants acquired and maintained interests in the rent-a-tribe enterprise, actively participated in the scheme, and conspired with Think Finance and others to repeatedly violate state lending statutes resulting in the collection of an unlawful debt from Plaintiffs and the class members. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962(a)-(d).

8.    Plaintiffs also assert a class claim for violations of California's usury laws and unjust enrichment. Because the loans exceed California's 10% annual percentage rate ("APR") cap, Defendants were prohibited from taking or receiving money in excess of 10% on the loans. Cal. Civ. Code § 1916-2. Accordingly, Plaintiffs seek to disgorge all amounts paid by California consumers, plus treble the amount of such usurious interest that was paid in the two years preceding the filing of this action. Cal. Civ. Code § 1916-3.

## JURISDICTION

9.    This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiffs Kimetra Brice and Earl Browne are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in California.

## PARTIES

11.    Plaintiff Kimetra Brice ("Brice") is a natural person and resident of the Richmond, California.

12.     Plaintiff Earl Browne ("Browne") is a natural person and resident of the Fairfield, California.

13.     Plaintiff Jill Darlene Novorot ("Novorot") is a natural person and resident of the Mission Viejo, California.

14.     Defendant Kenneth Rees ("Rees") is a natural person and resident of the state of Texas. At all times relevant, Rees was the president and chief executive officer of Think Finance, LLC and its subsidiaries, which Rees set up to make and collect on the usurious loans. Rees is also the founder, chief executive officer, and sole registered member of Tailwind Marketing, LLC ("Tailwind Marketing") and TC Decision Sciences, LLC ("TC Decisions").

15.     Defendant GPL Servicing ("GPLS") is a foreign corporation incorporated under the laws of the Cayman Islands.

16.     Defendant Plain Green, LLC ("Plain Green") is a limited liability company doing business as an internet lending website under the domain name www.plaingreenloans.com. Plain Green claims to be a "tribal lending entity wholly owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana, a sovereign nation located within the United States."[6] In return for a small fraction of the revenue, the Chippewa Cree Tribe allowed the lending scheme to use its name and falsely claim that it is operated by the Chippewa Cree Tribe. At all times relevant hereto, the Chippewa Cree Tribe did not participate in the day-to-day operations of Plain Green and did not fund the loans or handle the servicing or collection of the loans.

17.     Defendant Great Plains Lending, LLC ("Great Plains") is a limited liability company doing business as an internet lending website under the domain name www.greatplainslending.com. Great Plains claims to be a "tribal lending entity wholly owned by the Otoe-Missouria Tribe of Indians, a sovereign nation located within the United States."[7] In return for a small fraction of the revenue, the Otoe-Missouria Tribe allowed the lending scheme to use its name and falsely claim that it was "wholly owned" and operated by the Otoe-Missouria Tribe. At all times relevant hereto,

---

[6] Plain Green, *Home*, https://www.plaingreenloans.com/Default.aspx (last visited Feb. 22, 2018).

[7] Great Plains, *Home*, https://www.greatplainslending.com/ (last visited Feb. 22, 2018).

the Otoe-Missouria Tribe did not participate in the day-to-day operations of Great Plains and did not fund the loans or handle the servicing or collection of the loans.

18.     Defendant Haynes Investments, LLC ("Haynes Investments") is a limited liability company with a principal place of business in Dallas, Texas. Haynes Investment is a private equity company focused on investments related to Native American tribes. Haynes Investments claims that its "Native American investments have successfully monetized the tribal advantages of sovereignty to enhance yield while substantially reducing risk."[8] As explained below, Haynes Investment provided the initial capital to fund the operations of Plain Green.

19.     Defendant L. Stephen Haynes ("Mr. Haynes") is the managing partner and owner of Haynes Investments. Mr. Haynes's biography indicates that he "is one of the leading business executives in Native American project finance."[9] Mr. Haynes personally participated in the rent-a-tribe enterprise and signed each of the agreements used to fund the illegal loans.

20.     Defendant Victory Park Capital Advisors, LLC ("Victory Park") is a private equity firm headquartered in Chicago. As explained below, Victory Park invested no less than $250-$300 million in Plain Green and Great Plains.

21.     Defendant Victory Park Management, LLC ("VP Management") is a wholly owned subsidiary of Victory Park.

22.     Defendant Scott Zemnick is a partner at Victory Park and the firm's general counsel. Zemnick joined Victory Park in 2008 and "oversees the firm's legal operations and the structuring, negotiation, execution and protection of the firm's investment portfolio."[10] As the general counsel, Zemnick personally participated in the enterprise and had direct personal involvement in the unlawful conduct alleged herein.

---

[8] Haynes Investment, *American Indian*, http://www.haynesinvestments.net/native-american/ (last visited on Dec. 15, 2017).

[9] Haynes Investment, *About Us*, http://www.haynesinvestments.net/native-american/ (last visited on Dec. 15, 2017).

[10] Victory Park Capital, *Team – Legal, Investor Relations and Operations, Scott Zemnick*, https://www.victoryparkcapital.com/legaloperations.html (last visited on Dec. 19, 2017).

23.     Defendant Jeffrey Schneider ("Schneider") is a partner at Victory Park and the firm's chief financial officer. Schneider joined Victory Park in 2010 and "oversees the accounting, tax, finance, treasury and fund operations of the firm and assists in the structuring of VPC's investments."[11] As the chief financial officer, Schneider personally participated in the enterprise and had direct personal involvement in the unlawful conduct alleged herein.

24.     Defendant Thomas Welch ("Welch") is a partner and investment professional at Victory Park. According to his biography, Welch is "primarily responsible for sourcing, analyzing, executing, and management of direct private debt and equity investments in middle market companies within the specialty finance and financial technology sectors."[12] As explained below, Welch personally participated in the enterprise and had direct personal involvement in the unlawful conduct alleged herein.

## FACTUAL BACKGROUND

**A.     Statutory and Regulatory Background.**

25.     "Usury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations."[13] Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

26.     California, which was founded in 1850, has regulated maximum interest rates since 1872. *See id.* at 1385.

---

[11] Victory Park Capital, *Team – Legal, Investor Relations and Operations, Jeffrey Schneider*, https://www.victoryparkcapital.com/legaloperations.html (last visited on Dec. 19, 2017).

[12] Victory Park Capital, *Team – Legal, Investor Relations and Operations, Thomas Welch*, https://www.victoryparkcapital.com/legaloperations.html (last visited on Dec. 19, 2017).

[13] Usury laws are not unique to California or the United State of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

27. Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

28. Thus, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. ea Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing CAL. CONST. ART. XV § 1).

29. "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.* (citing Cal. Civ. Code § 1916–2).

30. California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

31. Thus, California law allows borrowers to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3; *Dev. Acquisition Group*, 776 F. Supp. 2d at 1165; Rickett, *supra*, at 1391.

**B. Overview of tribal lending.**

32. In a "payday" loan, a consumer who can't afford to wait until payday receives a cash advance and, in exchange, the lender subtracts a larger amount from the consumer's paycheck. Consumers renew the loans when they are unable to pay them off, creating a cycle of mounting debt.

33. Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra*, 69 Wash. & Lee L. Rev. at 759 (quoting Karen E. Francis, Note,

*Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

34. It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id*. at 764.

35. Prior to the rent-a-tribe business model, some payday lenders, including Think Finance, entered into partnerships with national banks to avoid compliance with state laws.[14]

36. Payday lenders used the banks as the conduit for the loans because the National Bank Act (and the federal preemption doctrine) allowed banks to charge "interest at the rate allowed by the laws of the State, Territory, or District where the bank" was located, 12 U.S.C. § 85, and some states do not have any interest rate caps. *Wolfe v. Ebert*, 37 B.R. 934, 936, n. 3 (D.S.C. 1983) (explaining that South Carolina repealed its usury laws in 1980).

37. Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n.16 (2012).

38. In response to the crackdown on rent-a-bank arrangement, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id.*; *see also* Martin & Schwartz, *supra*, 69 Wash. & Lee L. Rev. at 759.

39. "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation

---

[14] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

only, not the laws of the state in which the reservation is located or the state in which the borrower resides." *Id*.

**C.   Defendants establish a rent-a-tribe enterprise with the Chippewa Cree Tribe after regulators shut down their rent-a-bank arrangement.**

40.   Prior to the creation of the lending scheme at issue, Think Finance used a rent-a-bank lending model. (*See* Ex. 1).

41.   Under this arrangement, loans were originated in the name of First Bank of Delaware, but it served as nothing more than a nominal lender on behalf of Think Cash, Inc. ("Think Cash"), Think Finance's predecessor. (Ex. 1 at TF-PA-504641).

42.   In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans.  (Ex. 1 at TF-PA-504640).

43.   By contrast, through its wholly owned subsidiary TC Administrative, Think Cash received the "excess" of the cash flow after accounting for losses, management fees, and fixed rate interest payments to investors, *i.e.*, the third parties who invested money to allow Think Cash to grow the scheme. (Ex. 1 at TF-PA-504640).

44.   The Federal Deposit Insurance Corporation took steps to shut down Think Finance's arrangement with First Bank of Delaware through a cease and desist order directing it to terminate its relationship with "all third-party lending programs."[15]

45.   In response, Rees developed a solution for Think Finance—he decided to use the rent-a-tribe model as the new method to continue the scheme.[16]

---

[15] *See, e.g.*, *In the Matter of First National Bank*, Case No. FDIC-07-256b, Order to Cease and Desist, Order for Restitution, and Order to Pay (Oct. 9, 2008), *available at* https://www.fdic.gov/bank/individual/enforcement/2008-10-03.pdf.

[16] *See, e.g.*, Ben Walsh, *Outlawed By The States, Payday Lenders Take Refuge on Reservations*, Huffington Post (June 29, 2015, updated Sept. 8, 2015), http://www.huffingtonpost.com/2015/06/29/online-payday-lenders-reservations_n_7625006.html ("But by 2010, various federal regulators had all but shut down the [rent-a-bank] arrangement. Rees needed a new way to keep his business alive. The solution he found was relatively straightforward: He'd work with Native American tribes . . . .").

---

11

46. Indeed, Rees frankly informed the media that Think Finance abandoned doing direct lending itself because "byzantine state laws" cut into the profits.[17]

47. According to Rees, Native American tribes did not "have to look to each state's lending laws," and, thus, Think Finance solicited the Chippewa Cree Tribe to participate in the venture.

48. Shortly thereafter, the key companies involved in the enterprise—Think Finance, Haynes Investments, and Victory Park (through GPLS)—entered into a term sheet with the Chippewa Cree Tribe dated March 11, 2011. (Ex. 2).

49. Pursuant to the term sheet, Think Finance agreed to provide the infrastructure to run the lending operations, including the software, "risk management, application processing, underwriting assistance, payment processing, and ongoing service support" for consumer loans in the name of the Chippewa Cree Tribe. (Ex. 2 at 1).

50. On the other hand, Haynes Investments agreed to "provide funding to the Tribe to enable it to make each of the Loans," and to fund Plain Green's bank account with "sufficient monies to fund one business day of Loans based upon the average Loan volumes for the preceding month." (Ex. 2 at 1-2.)

51. Consistent with the term sheet, Haynes Investments provided the funds to Think Finance, which could only be used to fund loans originated in the name of Plain Green. (Ex. 2).

52. After the loans were originated in the name of Plain Green, 99% of the loans were "purchased" within two days by GPLS—an employee-less company who created by Victory Park "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See Think Finance, LLC, v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 24) (explaining Victory Park's creation of GPLS).

---

[17] Carter Dougherty, *Payday Lenders and Indians Evading Laws Draws Scrutiny* (June 4, 2012), http://stoppredatorygambling.org/wp-content/uploads/2012/12/2012-Payday-Lenders-and-Indian-Tribes-Evading-Laws-Draw-Scrutiny.pdf.

CLASS ACTION COMPLAINT

53.     As part of this process, GPLS refunded 99% of the funds provided by Haynes Investments, who also received: (1) 5% interest on the money loaned to the Tribe, and (2) 1% of the revenue collected on the loans as a "referral" fee.

54.     By contrast, GPLS paid "the Tribe 4.5% of cash revenue received" on the loans received by GPLS, as well as reimbursement for costs and expenses. (Ex. 1 at 2).

55.     After accounting for all expenses, GPLS paid a 20% fixed rate of return to Victory Park and the remaining revenue was distributed to TC Administrative Service, a wholly owned subsidiary of Think Finance.

**D.     The initial structure of the rent-a-tribe venture involving Great Plains.**

56.     On or around January 12, 2011, Think Finance pitched a similar rent-a-tribe arrangement to the Otoe-Missouria Tribe. (Ex. 3).

57.     As part of the presentation, Think Finance provided the Otoe-Missouria Tribe with an overview of its financial products, (Ex. 3 at TF-PA1677), the underwriting chain of command for the loans (Ex. 3 at TF-PA1680), the marketing strategy for the loans (Ex. 3 at TF-PA1680), the lending structure, and key contractual agreements, including a loan purchase agreement where GPLS would purchase loans originated by Great Plains within two days (Ex. 3 at TF-PA1681-1682).

58.     Great Plains did not exist prior to this meeting, and, as part of Think Finance's presentation, the next steps were "[c]reate tribal entity—Great Plains Lending, LLC," "setup tribal bank account at FBD," "review/approve consumer legal documents," and "[r]eview/sign contractual agreements." (Ex. 3 at TF-PA1686).

59.     Indeed, Think Finance had already registered the domain name for the Great Plains website, developed the text and graphics for the website, and raised the funds to make the loans—the final step was securing the tribe to serve as the front for the loans. (Ex. 3 at TF-PA1678).

60.     On February 24, 2011, the Otoe-Missouria accepted Think Finance's proposal, and Think Finance transferred the web address, www.greatplainslending.com, to Great Plains.

13

61.     On this same day, Kenneth Rees instructed Think Finance's key employees to "start your engines!!" (Ex. 4, at TF-VA001630).

62.     Great Plains' structure virtually copied the structure of Plain Green except that Great Plains received 6% of the revenues. (Ex. 3 at TF-VA1682).

**E.     Rees signed the key documents to establish and operate the rent-a-tribe enterprise.**

63.     TC Administrative, Tailwind, and TC Decision Sciences—all subsidiaries of Think Finance—served a dual purpose of returning as much money as possible to Think Finance, while at the same time concealing Think Finance's role in the scheme.

64.     For example, TC Administrative participated in the lending scheme as the designated administrative service provider and, more importantly, as the pass-through entity that received Think Finance's share of the profits of the scheme. (Ex. 3 at TF-VA1682).

65.     TC Administrative Services received the "net income" from the enterprises after accounting for the fixed return of 18-20% allocated to Victory Park for providing the capital to fund the loans through GPLS. (Ex. 3 at TF-VA1682).

66.     The relationship between TC Administrative and GPLS was formalized through an "Administrative Agency Agreement," signed by Rees as the chief executive officer of TC Administrative. (Ex. 5 at TF-VA000200-231).

67.     The Administrative Agency Agreement explains that Great Plains will "originate certain loans" to borrowers and "GPLS will purchase certain" loans from Great Plains. (Ex. 5 at TF-VA000200).

68.     GPLS hired TC Administrative, an employee-less company, as "a provider of certain management and administrative agent services," including: (1) establishing an account system and maintaining account ledgers for GPLS; (2) performing daily loan settlement reporting and accounting; (3) disbursing funds for the purchase of the loans by GPLS; (4) depositing funds

reflecting all principal, interest, fees and other amounts collected from borrowers into GPLS' collection account; and (5) paying the fixed return to GPLS's investors. (Ex. 5 at TF-VA000206-7 at § 2.2(a)-(p)).

69. Rees also signed the "Licensing and Support Agreement" between Great Plains and TC Decision Sciences, another subsidiary of Think Finance. (Ex. 6, at TF-VA589).

70. Pursuant to this agreement, TC Decision Sciences participated in the enterprises as the website operator and software administrator for Plain Green and Great Plains. (*See, e.g.*, Ex. 6; Ex. 3 at TF-VA1682).

71. In return, TC Decision Sciences received $50 for each loan funded, as well as $150 an hour for work and services it provided. (Ex. 6, at TF-VA590).

72. TC Decision Sciences also handled servicing responsibilities for Plain Green and Great Plains pursuant to servicing agreements, which were also signed by Rees. (*See, e.g.*, Ex. 7 at TF-VA610-616).

73. TC Decision Sciences servicing responsibilities included "customer support and collection services" under the guise of Great Plains. (Ex. 7 at TF-VA616). In exchange, TC Decision Sciences received $5 per month for each active account.

74. Pursuant to a marketing agreements—also signed by Rees—Tailwind handled the online and other advertisements for Plain Green and Great Plains. (*See, e.g.*, Ex. 8 at TF-VA594 ("Tailwind shall perform services reasonably required to market Loans within the parameters established by [Great Plains], via one or more websites, search engine optimization, call centers or other marketing channels….")).

75. Tailwind also handled the lead generation used to identify and solicit potential consumers,[18] and Tailwind received $100 for every borrower provided to Plain Green and Great Plains. (Ex. 8, at TF-VA608).

---

[18] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. Pew Charitable Trust, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/~/media/assets/2014/10/payday-lending-report/fraud_and_abuse_-online_harmful_practices_in_internet_payday_lending.pdf.

76.     Like the Chippewa Cree Tribe, the Otoe Missouria Tribe did not provide any of its money to make the loans.

77.     Instead, GPLS deposited the initial $1 million used to fund the illegal loans made in the name of Great Plains. (Ex. 9, Flow of Funds Overview, ¶ 1).

78.     After the loans were originated in the name of Great Plains—a process that had no tribal involvement—Great Plains "sold the loans at book value to GPLS," and the "proceeds from selling the participating interests" were then used by Great Plains "to originate additional loans." (Ex. 9 ¶ 3).

79.     A third-party bank then "processed customer payments on loans via ACH each day" and deposited those payments "into a Collection Account" belonging to GPLS. (Ex. 9 ¶ 4).

80.     At the end of each month, GPLS performed a "reconciliation of all cash revenue," and the revenue was remitted according to the contracts whereby 6% of the cash revenue collected was remitted to Great Plains.

81.     Great Plains' 6% percent, however, was illusory as it was reduced by payments to Tailwind and TC Decision Sciences. (Ex. 9 at ¶¶ 8-9).

**F.     Haynes Investments and Mr. Haynes's role in the enterprise.**

82.     As explained above, Haynes Investments provided the initial capital used to fund the Plain Green loans.

83.     Consistent with the term sheet, Haynes Investments provided the funds to Think Finance, which could only be used to fund loans originated in the name of Plain Green. (Ex. 2).

84.     As a result, Haynes Investments received monthly payments from Think Finance.

85.     Due to the success of the operation and the returns earned by Haynes Investments, increased its investment on several occasions.

86.     Upon information and belief, Haynes Investment increased its investment in Plain Green on multiple occasions from April 2011 through February 2015, resulting in substantial returns to Haynes Investments and Mr. Haynes.

87.     Haynes did not merely invest in the rent-a-tribe enterprise. Rather, Haynes used his connections to assist the enterprise's efforts to collect unlawful debt.

88.     Among other things, Haynes played an integral role in helping the enterprise obtain a bank willing to process payments through the Automated Clearing House Network (the "ACH Network"), an electronic payment processing system regulated by the National Automated Clearing House Association ("NACHA").

89.     Unlike other financial networks, the ACH Network allows financial institutions to send or take money directly out of a bank account without the requirement of a direct relationship between the financial institution and the borrower.

90.     Without access to the ACH Network, a payday lender would not be able to electronically process payments in batches or without participation of the consumer—necessary functions of companies who specialize in providing small dollar loans over the Internet. Elizabeth G. Balassone & Lauren L. Wroblewski, 17 No. 2 Fintech L. Rep. 1 (Mar. 2014) (explaining that "online lenders predominantly rely on electronic withdrawals and deposits to the consumer's bank account," which are carried out through bank connected to the ACH Network).

91.     Because of the vital role played by the ACH Network, "[s]tate and federal regulators, as well as the Department of Justice, have seized on the ACH Network as a way to stop online lending by out-of-state lenders." *Id.*

92.     For example, in August 2013, the New York Department of Financial Services issued a cease and desist to 117 banks placing "'the onus on the banks originating the debits'" to "ensure the legality of the underlying transactions submitted" through the ACH Network. *Id.* (quoting Letter from Benjamin M. Lawsky, New York Department of Financial Services "Re: Illegal Online Payday Loans Offered and Sold to New York Customers", available at http://www.dfs.ny.gov/about/press2013/pr130806-link1.pdf).

93.     Similarly, the Department of Justice launched "Operation Choke Point," an initiative aimed at financial institutions working with online lenders.

94.    In doing so, the Executive Director of the Financial Fraud Task Force explained that the government had "prioritized the role of financial institutions in mass marketing fraud schemes—including deceptive payday loans[.]" Michael J. Bresnick, Executive Director, Financial Fraud Enforcement Task Force, Address at the Exchequer Club of Washington, D.C. (Mar. 20, 2013), http://www.justice.gov/iso/opa/doj/speeches/2013/opa-speech-130320.html.

95.    Plain Green and Great Plains' were targeted by state and federal regulators and, as a result, banks ceased processing the debits and credits on their loans.

96.    Upon information and belief, Mr. Haynes played a critical role in finding a new bank to partner with Plain Green and Great Plains.

97.    Upon information and belief, based on his rapport with the Tribes through prior transactions, Mr. Haynes also acted as the liaison between Think Finance and the Tribes.

**G.    Victory Park's creation and control of GPLS.**

98.    Victory Park, through its ownership interest in and control over GPLS, provided substantial capital to fund the loans to consumers and worked together with the other entities described herein to systemically perpetrate fraud and to scam consumers.

99.    GPLS was a company created by Think Finance and Victory Park "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See Think Finance, LLC, v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 24) (explaining Victory Park's creation of GPLS).

100.    As explained above, GPLS purchased 99% of the interests in the loans originated by Plain Green and Great Plains within two days of the origination.

101.    According to Think Finance's  verified complaint against Victory Park, "Victory Park was the primary investor in a loan participation venture, GPLS," but "Victory Park required that Think Finance purchase a portion of the equity in GPLS, which it did through Think SPV." *Think Finance*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 26).

102.    Victory Park also raised money from third party investors to further grow the scheme. As part of this effort, Victory Park issued classes "shares to investors," in GPLS including

18

funds named "Series I-A and I-B, Series II and Series III." *Think Finance*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. ¶ 27).

103.    Victory Park and Think Finance collected the revenue generated from the consumer loans and after payment of all operating expenses, the loan program would distribute the fixed rate return to investors in GPLS and distribute the remaining revenue to Think Finance.

104.    Victory Park managed the distribution of interest payments to those investors and Victory Park received a 1% management fee off the top of those interest distributions.

105.    The shares, however, did not come with any management rights or entitle shareholders to exercise any voting rights relating to the management of GPLS. *Think Finance*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. ¶ 28).

106.    Instead, Victory Park also created "Management Shares," which were 100% owned and controlled by Victory Park, albeit through VP Management.

107.    Victory Park also substantially invested and reinvested its own funds into GPLS, including a $100 million dollar investment on or around July 2010.[19]

108.    Victory Park continued to invest and reinvest amounts in GPLS, including a $50 million dollar investment in late 2012, and additional nine figure investments between 2013-2016.

109.    As a result Victory Park continue to receive large payouts on their investment, including: (1) $75 million on March 31, 2017, (ii) $14 million on May 1, 2017, (iii) $42 million on May 10, 2017, and (iv) $6.2 million on May 31, 2017.

110.    Victory Park not only invested hundreds of millions of dollars in Plain Green and Great Plains, but Victory Park also participated in the affairs of the rent-a-tribe enterprise.

111.    On March 18, 2011, GPLS entered into a Participation Agreement with Plain Green, which was signed by Scott Zemnick as General Counsel for Victory park. (Ex. 10, Mar. 18, 2011 Participation Agreement).

---

[19] This investment was used to purchase loans originated by the rent-a-bank arrangement between Think Finance/FBD, which were transferred to GPLS after the creation of the rent-a-tribe scheme.

112.    Consistent with the Term Sheet, the Participation Agreement provided GPLS with the "right, but not the obligation," to purchase 99% of the participation interests in the loans originated in the name of Plain Green.

113.    In addition to the Participation Agreement, Victory Park also entered into an Administrative Agency Agreement with TC Administrative in which Victory Park appointed TC Administrative as its agent for the purpose of managing the enterprise's cash accounts. (Ex. 5).

114.    Under the Administrative Agency Agreement, Victory Park agreed to pay TC Administrative all residual revenues after payment of the tribe's "service fee" and Victory Park's 20% return, which was further guaranteed by "Guaranty and Security Agreement" between Victory Park and Think Finance. (Ex. 11, Mar. 18, 2011 Guaranty and Security Agreement).

115.    Because of the structure of the Participation Agreement, Victory Park controlled whether and to what extent loans originated in the name of Plain Green and Great Plains.

116.    When Victory Park stopped purchasing the participation interests, Plain Green and Great Plains stopped originating loans.

117.    For example, after the New York Department of Financial Services issued the cease and desist to Great Plains, Victory Park cut off funding to both Plain Green and Great Plains, which caused them to stop making new loans. *Pennsylvania by Shapiro v. Think Fin., Inc.*, No. 14-CV-7139, 2018 WL 637656, at *3 (E.D. Pa. Jan. 31, 2018) (describing an e-mail from Think Finance's CFO explaining that GPLS would stop purchasing loans due to the loss in *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F.Supp.2d 353 (S.D.N.Y. 2013), and GPLS's failure to purchase would cause "the tribal portfolios" to "go into wind down.").

118.    Victory Park not only invested in the rent-a-tribe ventures and controlled the amount of money available to the enterprise, but it also identified and solicited potential investors in the scheme.

119.    For example, Victory Park was successful in recruiting a number of large investors in the scheme, including at least one foreign institutional investor who decided to make the

investment after Victory Park and Think Finance's executives traveled overseas to pitch the rent-a-tribe venture.

**H.      Zemnick, Schneider, and Welch's personal involvement in the affairs of the enterprise.**

120.     During all relevant times, Zemnick, Schneider, and Welch were partners at Victory Park and participated in the affairs of the rent-a-tribe enterprise.

121.     At all times relevant hereto, Zemnick, Schneider, and Welch directly and actively managed Victory Park's activities with Plain Green, Great Plains, and Think Finance.

122.     Zemnick, Schneider, and Welch handled the day-to-day operation of Victory Park with respect to its relationship with Plain Green, Great Plains, and Think Finance.

123.     For example, Zemnick oversaw and personally directed the legal operations of Victory Park and participated in the structuring, negotiation, and execution of critical documents needed to establish and operate the enterprise.

124.     Among other things, Zemnick personally participated in the structuring, negotiation, and execution of the Term Sheet, the Participation Agreement, the Administrative Agency Agreement, the Guaranty and Security Agreement, and all subsequent amendments of those agreements.

125.     Each one of these documents were signed by Zemnick on behalf of Victory Park, as well as multiple amendments to each of the documents.

126.     Moreover, all notices required to be given under the agreements were to be delivered to Zemnick.

127.     By contrast, Schneider and Welch actively managed Victory Park's investment in GPLS, including receipt and review of weekly reports from Think Finance regarding the performance of Plain Green and Great Plains.

128.     Schneider and Welch also directed the major business decisions of Victory Park and GPLS with respect to the rent-a-tribe venture, including decisions on when to cease funding for the loans.

129. Zemnick, Schneider, and Welch knew the subject loans were a scam and illegal under state laws, but they nonetheless pursued the rent-a-tribe venture anyway, and continued to fund the loans even after Great Plains' loss in *Otoe-Missouria Tribe*, 974 F.Supp.2d at 356 ("There is simply no basis… that the Tribes are treated differently from any other individuals or entities that enter New York to lend to a New York resident.").

130. As a result, Zemnick, Schneider, and Welch are jointly and severally liable for the claims herein.

## I. Defendants' loans charged interest in violation of California's usury laws and RICO.

131. Defendants, together with Think Finance and its subsidiaries, marketed, initiated, and collected usurious loans in California.

132. Under the terms of the standard loan agreements, the interest rates charged were significantly greater than 10% APR—often between 118% and 448%, if not higher.

133. Plaintiffs obtained loans from Plain Green and Great Plains—each of those loans had interest rates far in excess of 10% APR.

134. For example, Brice's interest rate was 287.86% (Ex. 12 at 2)

135. Similarly, one of the Great Plains loans made to Novorot had an interest rate of 258.61% (Ex. 13 at 2).

136. Absent several exceptions—none of which apply in this case—California's Constitution prohibits any person from making loans to consumers in excess of 10% APR. Cal. Const. Art. XV § 1.

137. If a lender makes a loan in violation of Art. XV § 1, then "[n]o person, company, association, or corporation shall directly or indirectly take or receive in money, goods, or things" and the loan is void. Cal. Civ. Code § 1916-2.

138. Plaintiff Brice paid no less than $2,634.40 on her loans with Great Plains, including $1,940.75 within the past year—most of which was credited to interest and fees.

139.    Plaintiff Browne paid no less than $10,250.20 on his loans with Plain Green and Great Plains, including $2,377.05 within the past year—most of which was credited to interest and fees.

140.    Plaintiff Novorot paid no less than $6,179 on her loans with Great Plains, including $3,518.64 within the past year—most of which was credited to interest and fees.

141.    Because the interest rates on Plaintiffs' loans exceeded 10%, it was unlawful for any person, including Defendants, to collect or receive any interest, fees or charges on the loans.

142.    Upon information and belief, Defendants collected more than $100 million dollars from California consumer pursuant to these illegal loans within the past four years.[20]

143.    Pursuant to Cal. Civ. Code § 1916-3, Plaintiffs and the class members are entitled to recoup the any excess interest paid on these loans, as well as treble damages for any interest paid within the prior year.

144.    Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

145.    RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

146.    Defendants charged an interest rate far in excess of the enforceable rate established by Cal. Const. Art. XV § 1, and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

147.    As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

---

[20] Plaintiff provides this estimate based interrogatory responses from Think Finance indicating that $69.4 million was collected from Virginia consumers—a state with 21% of the population of California.

23

**<u>COUNT ONE:</u>**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)**
**(CLASS CLAIM AGAINST GPLS, VICTORY PARK, SCOTT ZEMNICK, JEFFREY SCHNEIDER, THOMAS WELCH, HAYNES INVESTMENTS, MR. HAYNES)**

148.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

149.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim against Defendants,[21] for themselves and on behalf of a class initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains.

150.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated and/or any payment was made on or after February 22, 2014.[22]

151.    **<u>Numerosity.</u> Fed. R. Civ. P 23(a)(1).** Numerosity will be easily satisfied in this case based on the number of loans at issue in California. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and/or Think Finance, and the class members may be notified of the pendency of this action by published and/or mailed notice.

152.    **<u>Predominance of Common Questions of Law and Fact.</u> Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions

---

[21] For the purpose of simplicity, Plaintiffs use the term "Defendants" in this Count to refer to all Defendants except Rees, Plain Green, and Great Plains. Plaintiffs do not assert a § 1962(a) violation as to Rees, Plain Green or Great Plains.

[22] Plaintiffs allege a subclass because they anticipate Defendants will argue that RICO's four-year statute of limitations applies to any loans originated or payments made prior to February 23, 2014. However, "the Supreme Court has established that the discovery-of-injury accrual rule applies to civil RICO actions." *Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.*, 493 F. App'x 390, 393 (4th Cir. 2012) (citing *Rotella v. Wood*, 528 U.S. 549, 556 (2000). Because consumers could not have known or reasonably discovered their injuries caused by *Defendants' conduct*, the proper class should include all consumers who entered into a loan agreement with Plain Green or Great Plains.

include: (1) whether Think Finance, Plain Green, Great Plains, the Chippewa Cree Tribe, the Otoe-Missouria Tribe, GPLS, Haynes Investments, and Victory Park constitute an "enterprise" under RICO; (2) whether Defendants received income derived from the unlawful collection of debt; (3) whether Defendants used or invested the part of that income to acquire an interest in, to establish, or to operate the enterprise; and (4) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

153.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

154.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

155.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

156.    **Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction prohibiting Defendants from continued collection of these illegal loans; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

157.    All of the loans made to California residents included an interest rate far in excess of twice the enforceable rate in California and, thus, the loans constitute "unlawful debt" under RICO. 18 U.S.C. § 1961(6).

158.    As alleged above, Defendants violated § 1962(a) of RICO through the receipt of income derived, directly and indirectly, through collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

159.    Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

160.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

161.    Accordingly, the Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)**
**(CLASS CLAIM AGAINST GPLS, VICTORY PARK, SCOTT ZEMNICK, JEFFREY**
**SCHNEIDER, THOMAS WELCH, HAYNES INVESTMENTS, MR. HAYNES)**

162.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

163.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim against Defendants,[23] for themselves and on behalf of a class initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated or any payment was made.

164.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated and/or any payment was made on or after February 22, 2014.

165.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Numerosity will be easily satisfied in this case based on the number of loans at issue in California. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and/or Think Finance, and the class members may be notified of the pendency of this action by published and/or mailed notice.

166.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Think Finance, Plain Green, Great Plains, the Chippewa Cree Tribe, the Otoe-Missouria Tribe, GPLS, Haynes Investments, and Victory Park constitute an "enterprise" under

---

[23] For the purpose of simplicity, Plaintiffs use the term "Defendants" in this Count to refer to all Defendants except Rees, Plain Green, and Great Plains. Plaintiffs do not assert a § 1962(a) violation as to Rees, Plain Green or Great Plains.

RICO; (2) whether Defendants acquired and maintained an interest in the enterprise; and (3) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

167.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

168.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

169.    **Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction prohibiting Defendants from continued collection of these illegal loans; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

170.    As alleged above, Defendants § 1962(b) of RICO by acquiring and maintaining interests in and control of the enterprise involved in the unlawful collection of debt.

171.    Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

172.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

173. As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

174. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

175. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated or any payment was made.

176. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated and/or any payment was made on or after February 22, 2014.

177. **Numerosity. Fed. R. Civ. P 23(a)(1).** Numerosity will be easily satisfied in this case based on the number of loans at issue in California. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and/or Think Finance, and the class members may be notified of the pendency of this action by published and/or mailed notice.

178. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Think Finance, Plain Green, Great Plains, the Chippewa Cree Tribe, the Otoe-Missouria Tribe, Haynes Investments, and Victory Park constitute an "enterprise" under RICO; (2) whether Defendants conducted the affairs or participated in the enterprise's affairs; (3) whether the

loans violated Art. XV § 1 of California's Constitution because their interest levels were too high; and (4) what is the proper recovery for Plaintiffs and the class members against each Defendant.

179. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

180. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

181. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

182. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the

class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction prohibiting Defendants from continued collection of these illegal loans; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

183.    All of the loans made to California residents included an interest rate far in excess of twice the enforceable rate in California.

184.    As alleged above, Defendants associated with the enterprise and participated in the affairs of the enterprise, which existed for the purpose of collection of unlawful debt.

185.    Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs to repay amounts on unlawful loans.

186.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

**COUNT FOUR:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

187.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

188.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated or any payment was made.

189.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in California when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated or any payment was made on or after February 22, 2014.

190.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by

31

Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

191.  **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

192.  **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

193.  **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

194.  **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction prohibiting Defendants from continued collection of these illegal loans; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

195.  As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to violate §§ 1962(a)-(c), including but not limited to: (1) the Term Sheet between the Haynes Investments, Chippewa Cree Tribe, Think Finance, and Victory Park (through GPLS),

CLASS ACTION COMPLAINT

(2) a similar term sheet between Otoe-Missouria Tribe, Think Finance, and Victory Park (through GPLS), and (3) the Participation, Administrative Agency, and Guaranty and Security Agreements.

196.   As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT FIVE:**
**VIOLATIONS OF CALIFORNIA USURY LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

197.   Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

198.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **California Usury Class**: All California residents who made a payment on any loan with Plain Green or Great Plains on or before February 22, 2015.

> **California Treble Damages Subclass**: All California residents who made a payment on any loan with Plain Green or Great Plains on or after February 22, 2016.

> Plaintiffs are members of this class and subclass.

199.   **Numerosity. Fed. R. Civ P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

200.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to California consumers violated Art. XV § 1 of California's Constitution because their interest levels were too high; (2) whether Plaintiffs may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against each Defendant.

33

201.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

202.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

203.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

204.   All of the loans made to California consumers in the name of Plain Green and Great Plains used an interest rate greater than 12%.

205.   As explained above, Defendants received the proceeds, directly and indirectly, of the loans originated in the names of Plain Green and Great Plains.

206. Accordingly, Plaintiffs and the class members are entitled to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3.

### COUNT SIX:
### UNJUST ENRICHMENT
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

207. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

208. Pursuant to Rule 23 of the Federal Rules of Civil Procedures, Plaintiffs bring this claim for themselves and on behalf of a class—the "California Unjust Enrichment Class"—initially defined as follows:

> **California Unjust Enrichment Class**: All California residents who executed a loan with Plain Green or Great Plains where the consumer repaid more than the original principal of the loan.

Plaintiffs are members of the unjust enrichment class.

209. **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

210. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

211. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

212. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

213. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

214. All of the loans to California consumers in the name of Plain Green and Great Plains were void.

215.    Plaintiffs and the class members conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

216.    Accordingly, on behalf of themselves and all other California consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Plain Green and Great Plains.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request the Court enter judgment for themselves and the class they seek to represent against Defendants, including for:

A.    Certification of this matter to proceed as a class action;

B.    Declaratory and injunctive relief as pled herein;

C.    Compensatory relief in an amount as pled herein;

D.    Treble damages pursuant to 18 U.S.C. § 1964(c) and Cal. Civ. Code § 1916-3;

E.    Attorney's fees, litigation expenses, and costs of suit; and

F.    Any further relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**PLAINTIFFS**

By:____/s/ *Craig C. Marchiando*_____
Craig C. Marchiando, Esq., (SBN 283829)
Leonard A. Bennett, Esq., (pro hac vice to be filed)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com

Kristi C. Kelly, Esq., (pro hac vice to be filed)
Andrew J. Guzzo, Esq., (pro hac vice to be filed)
**KELLY & CRANDALL, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com

Anna C. Haac (pro hac vice to be filed)
Andrew J. Silver (pro hac vice to be filed)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Phone: 202-973-0900
Fax: 202-973-0950
Email: ahaac@tzlegal.com
Email: asilver@tzlegal.com

*Counsel for Plaintiffs*

CLASS ACTION COMPLAINT

Anna C. Haac (pro hac vice)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Phone: 202-973-0900
Fax: 202-973-0950
Email: ahaac@tzlegal.com

*Attorneys for Plaintiffs*
*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMETRA BRICE, EARL BROWNE, and JILL NOVOROT**,** | Case No.: 3:18-cv-01200-WHO |
| Plaintiffs, | **NOTICE OF DEPOSITION OF L. STEPHEN HAYNES** |
| v. | |
| KENNETH REES; GPL SERVICING, LTD.; PLAIN GREEN, LLC; GREAT PLAINS LENDING, LLC; VICTORY PARK CAPITAL ADVISORS, LLC; VICTORY PARK MANAGEMENT, LLC; SCOTT ZEMNICK; JEFFREY SCHNEIDER; THOMAS WELCH; HANES INVESTMENTS, LLC; and L. STEPHEN HAYNES**,** | |
| Defendants. | |

PLEASE TAKE NOTICE on February 12, 2021 at 10:00 a.m. (CST), or as soon thereafter as feasible, before an officer duly qualified to administer oaths and take depositions, Plaintiffs shall proceed to take the Fed. R. Civ. P. 30(b)(1) deposition of L. Stephen Haynes. Pursuant to Fed. R. Civ. P 30(b)(3) and (b)(4) the deposition may be taken by telephone, video conference or other remote means. The witness will be placed under oath by an officer that will attend the deposition by the same remote means. Testimony may be recorded by audio, audiovisual, or stenographic means.

**DEFENDANT'S EXHIBIT**

**2**

1    Dated: February 2, 2021                    Respectfully submitted,

2
                                                By: /s/ Anna C. Haac
3                                               Anna C. Haac (pro hac vice)
                                                Mark A. Clifford (pro hac vice)
4                                               **TYCKO & ZAVAREEI LLP**
                                                1828 L Street, N.W., Suite 1000
5                                               Washington, DC 20036
                                                Phone: 202-973-0900
6                                               Fax: 202-973-0950
                                                Email: ahaac@tzlegal.com
7                                               Email: mclifford@tzlegal.com

8
                                                Sabita Soneji (SBN 224262)
9                                               **TYCKO & ZAVAREEI LLP**
                                                1970 Broadway, Suite 1070
10                                              Oakland, CA 94612
                                                Telephone (510) 254-6808
11                                              Facsimile (510) 210-0571
                                                Email: ssoneji@tzlegal.com
12
                                                Craig C. Marchiando, Esq., (SBN 283829)
13                                              Leonard A. Bennett, Esq., (pro hac vice)
                                                Amy Austin (pro hac vice)
14                                              **CONSUMER LITIGATION ASSOCIATES, P.C.**
                                                763 J. Clyde Morris Blvd., Ste. 1-A
15                                              Newport News, VA 23601
                                                Telephone: (757) 930-3660
16                                              Facsimile: (757) 930-3662
                                                Email: lenbennett@clalegal.com
17                                              Email: craig@clalegal.com
                                                Email: amyaustin@clalegal.com
18
                                                Kristi C. Kelly, Esq. (pro hac vice)
19                                              Andrew Guzzo, Esq. (pro hac vice)
                                                **KELLY GUZZO, PLC**
20                                              3925 Chain Bridge Road, Suite 202
                                                Fairfax, VA 22030
21                                              (703) 424-7572
                                                (703) 591-0167 Facsimile
22                                              Email: kkelly@kellyguzzo.com
                                                Email: aguzzo@kellyguzzo.com
23
                                                *Attorneys for Plaintiffs*
24

25

26

27

28

**CERTIFICATE OF SERVICE**

  The undersigned, Nicole Porzenheim, hereby certifies that on February 2, 2021, she caused a copy of the **NOTICE OF DEPOSITION OF L. STEPHEN HAYNES** to be served via electronic mail, upon the following counsel of record:

        Anna S. McLean
        Jacqueline Melissa Simonovich
        Sheppard Mullin Richter & Hampton LLP
        Four Embarcadero Center
        Seventeenth Floor
        San Francisco, CA 94111-4109
        (415) 434-9100
        Fax: (415) 434-3947
        Email: AMcLean@sheppardmullin.com
        Email: jsimonovich@sheppardmullin.com

        David Foster Herman
        Jonathan P. Boughrum
        Richard L. Scheff
        Michael Christopher Witsch
        Armstrong, Teasdale, LLP
        2005 Market Street, 29th floor
        One Commerce Square
        Philadelphia, PA 19103
        267-780-2015
        Email: dherman@armstrongteasdale.com
        Email: jboughrum@armstrongteasdale.com
        Email: rscheff@armstrongteasdale.com
        Email: mwitsch@armstrongteasdale.com

        */s/ Nicole Porzenheim*
        Nicole Porzenheim

Anna C. Haac (pro hac vice)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Phone: 202-973-0900
Fax: 202-973-0950
Email: ahaac@tzlegal.com

*Attorneys for Plaintiffs*
*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMETRA BRICE, EARL BROWNE, and JILL NOVOROT**,** | Case No.: 3:18-cv-01200-WHO |
| Plaintiffs, | **AMENDED NOTICE OF 30(b)(6) DEPOSITION OF HAYNES INVESTMENTS, LLC** |
| v. | |
| KENNETH REES; GPL SERVICING, LTD., PLAIN GREEN, LLC; GREAT PLAINS LENDING, LLC; VICTORY PARK CAPITAL ADVISORS, LLC; VICTORY PARK MANAGEMENT, LLC; SCOTT ZEMNICK; JEFFREY SCHNEIDER; THOMAS WELCH; HANES INVESTMENTS, LLC; and L. STEPHEN HAYNES**,** | |
| Defendants. | |

PLEASE TAKE NOTICE on February 12, 2021 at 10:00 a.m. (CST), or as soon thereafter as feasible, before an officer duly qualified to administer oaths and take depositions, Plaintiffs shall proceed to take the Fed. R. Civ. P. 30(b)(6) deposition of Defendant Haynes Investments, LLP. Pursuant to Fed. R. Civ. P 30(b)(6), one or more officers, directors, managing agents, or other persons shall be designated to testify on Defendant's behalf on each topic listed in Attachment A. The person or persons so designated shall testify as to all information known or reasonably available to the Defendant on each topic listed below. At least one person or other persons designated to testify as to each topic should have knowledge

DEFENDANT'S
EXHIBIT
**3**

042

1  of the documents referring or relating to the topic and the identity of the persons with knowledge of the

2  topic.

3    Pursuant to Fed. R. Civ. P 30(b)(3) and (b)(4) the deposition may be taken by telephone, video

4  conference or other remote means. The witness will be placed under oath by an officer that will attend

5  the deposition by the same remote means. Testimony may be recorded by audio, audiovisual, or

6  stenographic means.

7

8  Dated: February 2, 2021     Respectfully submitted,

9              By: */s/  Anna C. Haac*
            Anna C. Haac (pro hac vice)
10              Mark A. Clifford (pro hac vice)
            **TYCKO & ZAVAREEI LLP**
11              1828 L Street, N.W., Suite 1000
            Washington, DC 20036
12              Phone: 202-973-0900
            Fax: 202-973-0950
13              Email: ahaac@tzlegal.com
14              Email: mclifford@tzlegal.com

15              Sabita Soneji (SBN 224262)
16              **TYCKO & ZAVAREEI LLP**
            1970 Broadway, Suite 1070
17              Oakland, CA 94612
            Telephone (510) 254-6808
18              Facsimile (510) 210-0571
            Email: ssoneji@tzlegal.com

19              Craig C. Marchiando, Esq., (SBN 283829)
20              Leonard A. Bennett, Esq., (pro hac vice)
            Amy Austin (pro hac vice)
21              **CONSUMER LITIGATION ASSOCIATES, P.C.**
            763 J. Clyde Morris Blvd., Ste. 1-A
22              Newport News, VA 23601
            Telephone: (757) 930-3660
23              Facsimile: (757) 930-3662
            Email: lenbennett@clalegal.com
24              Email: craig@clalegal.com
            Email: amyaustin@clalegal.com
25

26              Kristi C. Kelly, Esq. (pro hac vice)
            Andrew Guzzo, Esq. (pro hac vice)
27              **KELLY GUZZO, PLC**

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned, Nicole Porzenheim, hereby certifies that on February 2, 2021, she caused a copy of the foregoing **AMENDED NOTICE OF 30(b)(6) DEPOSITION OF HAYNES INVESTMENTS, LLP** to be served via electronic mail, upon the following counsel of record:

> Anna S. McLean
> Jacqueline Melissa Simonovich
> Sheppard Mullin Richter & Hampton LLP
> Four Embarcadero Center
> Seventeenth Floor
> San Francisco, CA 94111-4109
> (415) 434-9100
> Fax: (415) 434-3947
> Email: AMcLean@sheppardmullin.com
> Email: jsimonovich@sheppardmullin.com
>
> David Foster Herman
> Jonathan P. Boughrum
> Richard L. Scheff
> Michael Christopher Witsch
> Armstrong, Teasdale, LLP
> 2005 Market Street, 29th floor
> One Commerce Square
> Philadelphia, PA 19103
> 267-780-2015
> Email: dherman@armstrongteasdale.com
> Email: jboughrum@armstrongteasdale.com
> Email: rscheff@armstrongteasdale.com
> Email: mwitsch@armstrongteasdale.com

> _/s/ Nicole Porzenheim_
> Nicole Porzenheim

## ATTACHMENT A

This subpoena requires you to appear for a deposition.  This Attachment A provides certain definitions and sets forth the matters on which you will be examined.  You should review this Attachment A carefully.

## DEFINITIONS

Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under the Federal and Local Rules of Civil Procedure. As used in these Requests, the following terms are to be interpreted in accordance with the definitions set forth below.

1.      "Defendant" or "Defendants" shall mean the named defendants in this Action, and/or any and all other person(s) acting on the named defendants' behalf or at their direction or control, including, but not limited to, present or former employees, staff personnel, agents, servants, consultants, investigators, contractors or subcontractors, advisors, counsel, accountants, representatives, or any other person compensated by that defendants, regardless of whether such compensation is based in whole or in part on commission or some other measure of performance or otherwise and regardless of whether considered or classified as independent contractors.

2.      "Plaintiffs" shall mean Kimetra Brice, Earl Browne, and Jill Novorot.

3.      "You" or "Your" shall mean Haynes Investments, LLC ("Haynes Investments") and/or any and all other person(s) acting on Haynes Investments' behalf or at Haynes Investments' direction or control, including, but not limited to, present or former employees, staff personnel, agents, servants, consultants, investigators, contractors or subcontractors, advisors, counsel, accountants, representatives, or any other person compensated by Haynes Investments, regardless of whether such compensation is based in whole or in part on commission or some other measure of performance or otherwise and regardless of whether considered or classified as independent contractors.

4.      "Document" and "Documents" should be interpreted in their broadest possible sense within the meaning of Rule 34(a) of the Federal Rules of Civil Procedure and shall mean the complete

046

original (or complete copy where the original is unavailable) and each non-identical copy (where different from the original because of notes made on the copy or otherwise) of any writing or record, as well as any attachment thereto or enclosure therewith, including but not limited to all written, typewritten, handwritten, printed, computerized, electronically created or stored, or graphic matter of any kind or nature, however produced or reproduced; any form of collected data for use with electronic data processing equipment; any physical object or thing, and any mechanical or electronic visual or sound recordings now or formerly in Your possession, custody or control or known to You regardless of physical location.  The term "document" includes, but is not limited to, e-mails, facsimiles, envelopes, voice-mail messages, transcripts, invoices, purchase orders, checks, receipts, letters and other correspondence, offers, contracts, agreements, bids, proposals, licenses, permits, reports to government agencies, ledgers, accounts receivable, accounts payable, account statements, financial statements, reports of any kind, minutes of meetings, sales estimates, sales reports, memoranda, notes, spreadsheets, calendar or diary entries, agendas, bulletins, graphs, charts, maps, photographs, drawings, surveys, data, price lists, summaries, telegrams, teletypes, computer printouts, magnetic tapes, discs, drives, electronic or hard-copy files, audio or video tapes, microfilm, and microfiche.

5.      "Communication(s)" means  the transmission, sending, or receipt of information of any kind (in the form of facts, ideas, inquiries, or otherwise), by one or more persons and/or between two or more persons by or through any means including, but not limited to, speech, writings, language (machine, foreign, or otherwise), computer electronics of any kind (including, but not limited to, e-mail, instant messaging, or other computer linkups), magnetic tape, videotape, photographs, graphs, symbols, signs, magnetic or optical disks, floppy disks, compact discs, CD-ROM discs, other removable or transportable media, sound, radio, or video signals, telecommunication, telephone, teletype, telexes, telecopies, facsimile, telegram, microfilm, microfiche, photographic film of all type, or other media of any kind.

6.      "Relate to," "refer to," "with respect to," "reflect," "regarding," "pertaining to" or "concerning" means mentioning, discussing, reflecting, containing, consisting of, evidencing,

embodying, stating, dealing with, making reference or relating to in any way, or having any logical or factual connection with the subject matter identified in a discovery request.

7.       "Think Finance" means Think Finance, Inc. and any of its subsidiaries, affiliates, predecessors or successors.

8.       "Elevate" means Elevate Credit, Inc.

9.       The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the scope of this Request inclusive rather than exclusive.

10.      The use of the singular form of any word shall include the plural and vice-versa.

11.      The present tense includes the past and future tenses. Words in the masculine, feminine or neuter form shall include each of the other genders.

## MATTERS ON WHICH EXAMINATION REQUESTED

1.       Haynes Investments' involvement in any aspect of the tribal lending enterprise alleged in Plaintiffs' operative Complaint, including but not limited to those activities described in Defendant L. Steven Haynes' Revised Responses and Objections to Plaintiff Kimetra Brice's First Set of Interrogatories, incorporated by reference in Defendant Haynes Investments, LLC's Revised Responses and Objections to Plaintiff Kimetra Brice's First Set of Interrogatories.

2.       Efforts to find tribal partners for Think Finance, whether or not those relationships ever materialized, including without limitation efforts relating to partnering with the Chippewa Cree Tribe, the tribe referenced in Haynes0001750-1751, and the Fallon Paiute-Shoshone Tribe, as reflected in Haynes0000786, Haynes0001022-1026, Haynes0002594-2603, Haynes0002604-2633.

3.       The circumstances surrounding the creation of Plain Green, and Haynes Investments' involvement in the same, including but not limited to the involvement described in response to Interrogatory No. 2 in  Defendant L. Steven Haynes' Revised Responses and Objections to Plaintiff Kimetra Brice's First Set of Interrogatories, incorporated by reference in Defendant Haynes Investments, LLC's Revised Responses and Objections to Plaintiff Kimetra Brice's First Set of Interrogatories.

4.      The flow of funds relating to the loans originated by the tribal lending enterprise alleged in Plaintiffs' operative Complaint, including Haynes Investments' financing of any such loans, as set forth in, *inter alia*, Haynes0002570-2571 and reflected in Haynes0000059-60, TF-VA0527822, and TF-VA0549945.

5.      Any agreements, as well as changes thereto over time and/or terminations of the same, that Haynes Investments entered into regarding the tribal lending enterprise alleged in Plaintiffs' operative Complaint, including (a) credit facility agreements, such as those at Haynes0003179-3190, Haynes0000384-395, Haynes0000267-268, and Haynes0002658-2661; (b) referral agreements, such as at Haynes0001159-1167; (c) promissory notes, such as those at Haynes0001222-1253 and Haynes0001255-1260; and (d) the agreement reflected at Haynes0001873-1875.

6.      ACH processing issues experienced by the tribal lending enterprise alleged in Plaintiffs' operative Complaint, such as without limitation those reflected in TF-VA0537502, TF-VA0171268-0171270, and TF-VA0168990, as well as Haynes Investments' efforts to find banks, credit and debit card processors, and/or ACH processors to process the loans—and payments related thereto—issued by the tribal lending enterprise alleged in Plaintiffs' operative complaint, including without limitation those efforts reflected in the afore-mentioned documents, as well as TF-VA0171211-0171212, TF-VA0537426-0537427, TF-VA0525837-0525838, TF-VA0169608-0169612, TF-VA041396, TF-VA0169273.

7.      Requirements pertaining to bank account access, draws on bank account funds, liens on bank accounts and/or liens on loan monies held by Think Finance's tribal partners, such as those discussed at Haynes0002658.

8.      Efforts to establish a tribal lending association, as discussed in Haynes0002193-2194, Haynes0002195-2209, and Haynes0002214, including Haynes Investments' involvement in the same, such as without limitation as reflected in Haynes0002230-2231.

9.      The amount, date, source, and further distribution of income, fees, and/or revenue (as well as the reason for the same) received by Haynes Investments connected in any way with the lending enterprise alleged in Plaintiffs' operative Complaint, including without limitation "Haynes investments

revenue share" referred to in Haynes0002232 and payment(s) made to Haynes Investments pursuant to the Referral Agreement described in response to Interrogatory No. 4 in Defendant L. Steven Haynes' Revised Responses and Objections to Plaintiff Kimetra Brice's First Set of Interrogatories, incorporated by reference in Defendant Haynes Investments, LLC's Revised Responses and Objections to Plaintiff Kimetra Brice's First Set of Interrogatories.

10. The amount, date, source, use, and further distribution of any loans or advances received by Haynes Investments connected in any way with the lending enterprise alleged in Plaintiffs' operative Complaint, such as are reflected in Haynes0000396-397, Haynes0001299-1300, Haynes0001301-1302, Haynes0001312-1313, Haynes0001310-1311.

11. Investment of funds on behalf of Think Finance by Haynes Investments, as discussed at Haynes0002671-2674.

12. Transactions reflected in Haynes0003232-3245.

13. Invoices, payables, and receivables reflected in Haynes0003246-3313 and Haynes0003327-43.

14. The operational, financial, and legal relationships (including but not limited to any compensation arrangement and any contracts between these entities) between Haynes Investments and each of the following entities: Great Plains, the Otoe-Missouria Tribe, Plain Green, the Chippewa Cree Tribe, Think Finance, TC Administrative Service, Tailwind Marketing, TC Decision Sciences, GPL Servicing Agent, LLC, GPL Servicing Trust I, GPL Servicing Trust II, and/or GPL Servicing Ltd., including but not limited to those described in response to Interrogatory Nos. 11 and 17 in Defendant L. Steven Haynes' Revised Responses and Objections to Plaintiff Kimetra Brice's First Set of Interrogatories, incorporated by reference in Defendant Haynes Investments, LLC's Revised Responses and Objections to Plaintiff Kimetra Brice's First Set of Interrogatories.

15. The operational, financial, and legal relationships (including but not limited to any compensation arrangement and any contracts between these entities) between Haynes Investments and Sovereign Business Solutions.

16.     Haynes Investments' knowledge of, and the identity of any individuals known to Haynes Investments to have knowledge of, the operational, financial, and legal relationships (including but not limited to any compensation arrangement and any contracts between these entities) between Sovereign Business Solutions and Plain Green.

17.     The operational, financial, and legal relationships (including but not limited to any compensation arrangement and any contracts between these entities) between Haynes Investments and each of the following entities: Victory Park Capital Advisors, Victory Park Credit Opportunities Maser Fund, Ltd., Victory Park Management, LLC, and/or VPC/TF Trust I.

18.     Haynes Investments' responses to Plaintiffs' discovery requests and its Answer to Plaintiffs' operative Complaint, including but not limited to:

    a.   efforts to identify documents responsive to Plaintiffs' Requests for Production;

    b.   any ESI search terms used by Haynes Investments to gather documents;

    c.   the custodians and other persons from whom documents were obtained and whose possession was searched or queried;

    d.   efforts to provide full and complete responses to Plaintiffs' Interrogatories;

    e.   names of individuals who were contacted for the purpose of responding to Plaintiffs' Interrogatories or providing Haynes Investments' Answer to Plaintiffs' operative Complaint, and the information provided by each individual;

    f.   the basis for the contentions provided in response to Plaintiffs' Requests for Production and Interrogatories, and in Haynes Investments' Answer to Plaintiffs' operative Complaint.

19.     All interactions that Haynes Investments or its representatives have had with any government body, including the Federal Trade Commission, the Consumer Financial Protection Bureau, any state Attorney General's office or any similar state agency regarding Plain Green, Great Plains, Think Finance, or any aspect of the lending enterprise alleged in Plaintiffs' operative Complaint.

20.     Haynes Investments' knowledge of, and the identity of any individuals known to Haynes Investments to have knowledge of, usury law and Think Finance's compliance with applicable usury laws.

21.     Haynes Investments' knowledge of, and the identity of any individuals known to Haynes Investment to have knowledge of, regulatory or other government enforcement actions targeting Think Finance or others involved in the payday lending industry.

22.     Haynes Investments' knowledge of, and the identity of any individuals known to Haynes Investments to have knowledge of, regulatory of other government enforcement actions targeting Great Plains, Plain Green, Think Finance, or other entities offering tribal lending products.

23.     Haynes Investments' knowledge of, and the identity of any individuals known to Haynes Investments to have knowledge of, Think Finance's tribal lending business model.

24.     Haynes Investments' knowledge of, and the identity of any individuals known to Haynes Investment to have knowledge of, the regulatory risks associated with Think Finance's rent-tribal lending business model.

25.     Haynes Investments' knowledge of, and the identity of any individuals known to Haynes Investment to have knowledge of, the involvement of Linda Stinson, Mike Stinson, Stephen Shaper, 7HBF No. 2, Ltd., John D. Harvison, John H. Harvison, and/or Startup Capital Ventures, L.P. in any aspect of the lending enterprise alleged in Plaintiffs' operative Complaint.

FILED
4/6/2020 3:38 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Stephanie Clark DEPUTY

## CAUSE NO. DC-19-13904

| | | |
|---|---|---|
| THINK FINANCE, L.L.C. | § | IN THE DISTRICT COURT OF |
|    *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | |
| L. STEVEN HAYNES d/b/a | § | |
| Haynes Investment, Inc., and | § | |
| HAYNES INVESTMENTS, L.L.C. | § | |
| H&R WHOLESALE, L.L.C., f/k/a | § | |
| RJK Vending Funding, L.L.C. | § | |
| REDLICH INVESTMENTS, L.L.C., | § | |
| SRILLS, L.L.C., | § | |
| JEREMY ROUNSVILLE, | § | |
| SAFEDECIDE, L.L.C. | § | DALLAS COUNTY, TEXAS |
| SRILLS TECHNOLOGY, L.L.C., | § | |
| TANGENT GAMING TX, L.L.C., f/k/a | § | |
| YNS SERVICES, L.L.C., | § | |
| YNS GENERAL CONTRACTORS, L.L.C., | § | |
| YNS INVESTMENTS, L.P. | § | |
| YVONNE HOPEN, a/k/a Yvonne Hoppen, | § | |
| SAAH MANAGEMENT SERVICES, L.L.C. | § | |
| N73CL, L.L.C., | § | |
| 2 H LENDING MANAGEMENT | § | |
|   SERVICES, L.L.C., | § | |
| JOHN DAUGOMAH, | § | |
| CSB ENTERPRISES, L.L.C., | § | |
|   *Defendants* | § | 160th JUDICIAL DISTRICT |

---

## PLAINTIFF'S SECOND AMENDED PETITION

---

Plaintiff Think Finance, L.L.C. ("Think Finance") files this Plaintiff's Second Amended Petition.

## I.
## DISCOVERY LEVEL (Level 2)

   **1.**    Discovery is intended by Think Finance to be conducted pursuant to Rule 190.3 of the Texas Rules of Civil Procedure in accordance with the scheduling order entered by the Court.

---

**PLAINTIFF'S SECOND AMENDED PETITION**                ge   1

**DEFENDANT'S EXHIBIT 4**

053

## II.
## PARTIES

**2.**     Think Finance is a Delaware limited liability company, duly authorized to transact business in the State of Texas, with its principal place of business located in Dallas County, Texas.

**3.**     Defendant L. Steven Haynes ("Haynes"), is a natural person who resides in Dallas County, Texas.  Haynes has already been served with citation and has made a general appearance in this matter.  As described below, Haynes has transacted business in Texas with Think Finance using the name "Haynes Investment Inc."   Long before any of the transactions with Think Finance, there was a Texas corporation named Haynes Investments, Inc. which was formed on January 31, 1989, but which dissolved on December 16, 1992.  All of the transactions which form the basis of this lawsuit occurred long after the date of dissolution.  As described below, L. Steven Haynes is the manager and a member of Srills, L.L.C., a Minnesota limited liability company which has been inactive and was administratively terminated on March 16, 2018.

**4.**     Haynes Investments, L.L.C. is a Texas limited liability company with its principal place of business located in Dallas County, Texas.  Haynes Investments, L.L.C, has already been served with citation and has made a general appearance in this matter.

**5.**     Defendant H&R Wholesale, L.L.C., ("H&R"), formerly known as RJK Vending Funding, L.L.C., is a Delaware limited liability company with its principal place of business in Dallas County, Texas.  H&R may be served with citation and a copy of this petition by serving Henry Joseph Redlich III, its manager, at the following address:

> H&R Wholesale, L.L.C.
> c/o Henry Joseph Redlich III, manager
> 4342 Margate
> Dallas, Texas  75220

6.      Defendant Redlich Investments, L.L.C., ("Redlich"), is a Texas limited liability company with its principal place of business in Dallas County, Texas.  Redlich may be served with citation and a copy of this petition by serving Henry J. Redlich, its registered agent for service of process, at the following address:

> Redlich Investments, L.L.C.
> c/o Henry J. Redlich, registered agent
> 4342 Margate
> Dallas, Texas  75220

7.      Defendant Srills, L.L.C. ("Srills") is a Minnesota limited liability company which has been inactive and was administratively terminated on March 16, 2018.   Srills may be served with citation and a copy of this petition by serving L. Steven Haynes, its manager, at his usual place of residence located at:

> Srills, L.L.C.
> c/o L. Steven Haynes, manager
> 4215 San Carlos St.
> Dallas, Texas  75205

8.      Defendant Jeremy Rounsville ("Rounsville") is a natural person whose home address is unknown to Think Finance but who was a member and the CEO of Srills when it was administratively terminated on March 16, 2018.   Rounsville may be served with citation and a copy of this petition by serving him wherever he may be located.

9.      Defendant SafeDecide, L.L.C. ("SafeDecide") is a Texas limited liability company with its principal place of business in Dallas County, Texas.  SafeDecide may be served with citation and a copy of this petition by serving L. Steven Haynes, its registered agent for service of process, at the following address:

> SafeDecide, L.L.C.
> c/o L. Steven Haynes, registered agent
> 4215 San Carlos St.
> Dallas, Texas  75205

10.     Defendant Srills Technology, L.L.C. ("Srills Technology") is a Delaware limited liability company with its principal place of business in Dallas County, Texas.  Srills Technology may be served with citation and a copy of this petition by serving Registered Office Service Company, its registered agent for service of process, by certified mail at the following address:

> Srills Technology, L.L.C.
> c/o Registered Office Service Company, registered agent
> 614 N. Dupont Hwy., Suite 210
> Dover, DE  19901

11.     Defendant Tangent Gaming TX, L.L.C. ("Tangent") is a Delaware limited liability company with its principal place of business in Dallas County, Texas.  Tangent may be served with citation and a copy of this petition by serving A Registered Agent, Inc., its registered agent for service of process, by certified mail at the following address:

> Tangent Gaming TX, L.L.C.
> c/o A Registered Agent, Inc., registered agent
> 8 The Green, Ste A
> Dover DE  19901

12.     Defendant YNS Services, L.L.C. ("YNS") is a Delaware limited liability company with its principal place of business located in Dallas County, Texas.  YNS may be served with citation and a copy of this petition by serving L. Steven Haynes, its registered agent for service of process, at the following address:

> YNS Services, L.L.C.
> c/o L. Steven Haynes, registered agent
> 7515 Lemmon Avenue, Hangar R
> Dallas, Texas  75209

13.     Defendant YNS General Contractors, L.L.C., d/b/a YNS GC ("YNS-GC") is a Texas limited liability company with its principal place of business located in Dallas County, Texas.  YNS-GC may be served with citation and a copy of this petition by serving L. Steven Haynes, its registered agent for service of process, at the following address:

> YNS General Contractors, L.L.C.
> c/o L. Steven Haynes, registered agent
> 7515 Lemmon Avenue, Hangar R
> Dallas, Texas  75209

14.     Defendant YNS Investments, L.P. ("YNS-LP") is a Texas limited partnership with its principal place of business located in Dallas County, Texas.  YNS-LP may be served with citation and a copy of this petition by serving L. Steven Haynes, its registered agent for service of process, at the following address:

> YNS Investments, L.P.
> c/o L. Steven Haynes, registered agent
> 7515 Lemmon Avenue, Hangar R
> Dallas, Texas  75209

15.     Yvonne Hopen, a/k/a Yvonne Hoppen, ("Yvonne") is a natural person who resides in Dallas County, Texas.  Yvonne may be served with citation and a copy of this petition at her usual place of residence located at:

> Yvonne Hopen, a/k/a Yvonne Hoppen
> 4215 San Carlos St.
> Dallas, Texas  75205

16.     Defendant SAAH Management Services, L.L.C. ("SAAH") is a Florida limited liability company with its principal place of business in Winter Park, Florida.  SAAH may be served with citation and a copy of this petition by serving CS Sunbiz, L.L.C., its registered agent for service of process, by certified mail at the following address:

> SAAH Management Services, L.L.C.
> c/o CS Sunbiz, L.L.C., registered agent
> 700 W. Morse Blvd., Suite 220
> Winter Park, Florida  32789

17.     Defendant N73CL, L.L.C. ("N73CL") is a Texas limited liability company with its principal place of business located in Dallas County, Texas.  N73CL may be served with

citation and a copy of this petition by serving L. Steven Haynes, its registered agent for service of process, at the following address:

>  N73CL, L.L.C.
>  c/o L. Steven Haynes, registered agent
>  7515 Lemmon Avenue, Hangar R
>  Dallas, Texas  75209

18.     Defendant 2H Lending Management Services, L.L.C. ("2H Lending") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware. 2H Lending may be served with citation and a copy of this petition by serving The Corporation Trust Company, its registered agent for service of process, by certified mail at the following address:

>  2H Lending Management Services, L.L.C.
>  c/o The Corporation Trust Company, registered agent
>  Corporation Trust Center, 1209 Orange St.
>  Wilmington, DE  19801

19.     Defendant John Daugomah ("Daugomah") is a natural person who resides in McKinley County, New Mexico. Daugomah may be served with citation and a copy of this petition at his usual place of residence located at:

>  John Daugomah
>  P.O. Box 934
>  Crownpoint, New Mexico  87313-0934

20.     Defendant CSB Enterprises, L.L.C. ("CSB") is a limited liability company formed in the Navajo Nation with its principal place of business in Crownpoint, New Mexico.  CSB may be served with citation and a copy of this petition by serving John Daugomah, its manager, by certified mail at the following address:

>  CSB Enterprises, L.L.C.
>  c/o John Daugomah
>  P.O. Box 934
>  Crownpoint, New Mexico  87313-0934

### III.
### SUBJECT MATTER JURISDICTION

21.     Pursuant to Section 24.007(b) of the Texas Government Code, jurisdiction is proper in this Court because the matter in controversy is more than $500, exclusive of interest.

### IV.
### VENUE

22.     Pursuant to Sections 15.002(a)(1) of the Texas Civil Practice and Remedies Code, venue is proper in Dallas County because all or a substantial part of the events or omissions giving rise to the claim occurred in Dallas County, Texas.  Pursuant to Sections 15.002(a)(2) of the Texas Civil Practice and Remedies Code, venue is proper in Dallas County because Defendant Haynes is a natural person who resided in Dallas County, Texas, at the time the cause of action accrued.  Pursuant to Sections 15.002(a)(3) of the Texas Civil Practice and Remedies Code, venue is proper in Dallas County because Defendant Haynes Investments, L.L.C. is not a natural person and its principal office in this state is located in Dallas County, Texas. Pursuant to Sections 15.092 of the Texas Civil Practice and Remedies Code, venue is proper in Dallas County because this is a suit on a written contract that promises performance at a particular place in Dallas County.

### V.
### CLAIM FOR RELIEF

23.     Pursuant to Rule 47 of the Texas Rules of Civil Procedure, in this case Think Finance seeks monetary relief over $1,000,000.

### VI.
### SUMMARY OF THE CASE

24.     This is fundamentally a suit on a promissory note.  Think Finance advanced funds to Haynes to invest in various tribal-related industries, subject to the written approval of Think

---

Finance.  The note has matured, and not been repaid.  The note provides that, in lieu of interest, Think Finance will receive 50% of all dividends, fees, interest and capital appreciation earned by the invested principal, net of taxes paid, in addition to repayment of the principal.  Accordingly, Think Finance brings this suit to collect the balance due under the note, including its share of the dividends, fees, interest and capital appreciation earned by the investments in each of the tribal-related industries.

**VII.**
**FACTS**

25.     Think Finance is a company that provides technology, analytics, and marketing services to financial businesses in the consumer lending industry.

26.     Haynes is a businessman who specializes in business and industry investments with Native American tribes.  Prior to the execution of the notes, Think Finance and Haynes had a previous business relationship dating back to 2011.  Throughout the course of this ten-year relationship, Haynes repeatedly represented to Think Finance that he was acting on behalf of "Haynes Investments, Inc., a Texas corporation."  Haynes signed numerous documents which he delivered to Think Finance in which he purports to act as an officer or director of Haynes Investments, Inc., a Texas corporation. Haynes also sent "Invoices" to an affiliate of Think Finance purportedly on behalf of Haynes Investments, Inc.  Haynes further directed Think Finance to wire money to a bank account at Wells Fargo Bank purportedly held in the name Haynes Investments, Inc.  Defendants admit that Haynes Investments, Inc. ceased to exist long before Haynes signed any of these documents.

**The Haynes/Think Finance Notes**

27.     On June 18, 2015, Haynes signed a Promissory Note in the amount of $5,269,000 payable to Think Finance, Inc. (the "Original Note").

28.     On October 20, 2017, Haynes signed an Amended and Restated Promissory Note in the amount of $5,269,000 payable to Think Finance, L.L.C. (the "Amended Note").  A true and correct copy of the Note is attached to this petition as Exhibit A.

29.     Haynes signed both notes ostensibly in a representative capacity for "Haynes Investments, Inc., a Texas Corporation":



Haynes did not disclose to Think Finance that the purported maker of the notes had, in reality, dissolved more than twenty years earlier.

30.     As described in the Original Note:

> The monies will be invested in Tribal related industries and all returns (the "Rate of Return") from the date hereof until the Note is paid in full, Holder will be entitled to 50% of all interest, fees, rents, royalties, dividends, and capital appreciation earned by the invested principal (net of taxable paid), less any amounts paid as interest. . .

As described in the Amended Note:

> (b) Payment of dividends, fees, interest and capital appreciation.  Monies have been invested by Borrower in tribal related industries.  In consideration of the Principal Amount owed to Holder under this Note, until the Note is paid in full, Holder shall be entitled to receive 50% of all interest, fees and dividends earned by the invested principal (net of taxes paid).  Such payment will be made to Holder by Borrower on the Maturity Date.

Essentially, the parties agreed to split the profits from the investments made by Haynes in tribal related industries using Think Finance's money.

**31.**     In the Original Note, the parties agreed that the funds from Think Finance were to be invested either "in short term instruments, or instruments with a maturity of one year or less" bearing interest of "not less than 10% per annum," or "in long term projects, or instruments with a maturity greater than one year (which will be approved by Holder)" targeting "20% as the minimum annual return."

**32.**     In exchange for managing these tribal-related industry investments, Haynes would become entitled to a management fee as described in the notes.

**33.**     Over time, the notes were funded by deposits into bank accounts with Wells Fargo and Origin Bank as directed by Haynes.  Some of these accounts were in the name of Haynes Investments, L.L.C., a limited liability company of which Haynes is the sole manager. Haynes then "invested" the money in various other business entities.

**34.**     Pursuant to both the Original Note and the Amended Note:

3.  APPROVAL OF INVESTMENTS:

(a)     Borrower shall present to Holder ALL proposed investments of the principal.  Holder has the right to deny any proposed investment for any reason.

* * *

6.  NOTICES, ETC.

All notices, waivers and other communications provided for hereunder shall be in writing. . .

* * *

11.  MISCELLANEOUS

. . .This Note may not be amended or supplemented except in a writing signed by the Borrower and the Holder.  No course of dealing and no failure on the part of the Holder to exercise, and no delay in exercising, any right hereunder shall operate as a waiver hereof. . .

Therefore, Haynes was required to present to Think Finance in writing all proposed investments of the principal, and no course of dealing between the parties to the contrary could operate as a waiver of this requirement.

35.     As funds accumulated for investment under the Original Note, Haynes presented a single investment to Think Finance for approval.  Think Finance rejected it.

36.     In 2016, Think Finance contacted Haynes to determine what had become of the funds he was to manage and invest in tribal-related industry investments.  Think Finance learned that Haynes had invested such funds into several businesses without Think Finance's approval, including several businesses in which Haynes, or entities he controls, personally owned a business interest.   Think Finance requested more detailed information concerning these business investments from Haynes, but Haynes substantially failed to provide such information.

37.     In 2017, Think Finance contacted Haynes to wind down the investments he was managing and to accelerate repayment of the Original Note.  Haynes indicated that it would take him a year to wind down the investments.   Haynes also argued that winding down the investments and accelerating repayment of the note would damage him, entitling him to a discount for what Haynes would be giving up in order to call the underlying investments early. The Amended Note is the result of these negotiations.

38.     In accordance with the terms of the Amended Note, Haynes made various mandatory prepayments as required by paragraph 2(b) of the Amended Note and has earned the negotiated discount of $269,000 as described in paragraph 1(a) of the Amended Note.   In calculating the amount owed, Think Finance has given credit for this discount described in paragraph 1(a) of the Amended Note.  The negotiated discount of $269,000 constitutes an accord

as to any damages claimed for winding down the investments and accelerating repayment of the note.

39.     The Maturity Date of the Amended Note is June 15, 2019, at which time the remaining principal amount of the note became due and payable in accordance with paragraph 1(a) of the Amended Note.  Think Finance's 50% of all interest, fees, and dividends earned by the invested principal (net of taxes) also became due and payable at the maturity date in accordance with paragraph 1(b) of the Amended Note.

40.     On June 10, 2019, Think Finance sent a letter to Haynes reminding him that the Amended Note would be coming due.  On June 13, 2019, Think Finance sent a letter to Haynes with payment instructions presenting its claim for the net principal amount of $2,107,413, together with 50% of all interest, fees, dividends and capital appreciation earned by the invested principal (net of taxes) due under the Amended Note on June 15, 2019.  This demand gives Haynes full credit for the discount of $269,000 as described in paragraph 1(a) of the Amended Note as well as for the $300,000 management fee described in paragraph 10 of the Amended Note Haynes was entitled to if he timely paid the Amended Note.

41.     Haynes has failed to pay the balance due.  Think Finance seeks a judgment for the full amount owed under the Amended Note.

42.     Because Haynes has failed to pay the balance due on the maturity date, has failed to provide a proper accounting of the tribal-related industry investments he was purportedly managing, and has engaged in acts of self-dealing by investing the funds in businesses he himself owns, Haynes was forfeited his $300,000 management fee.  Think Finance seeks a judgment for this amount as well.

**The Due Diligence Examination**

    **43.**    In order to determine the amount of interest, fees, and dividends earned by the invested principal (net of taxes) and to provide a short-term forbearance to enable Haynes to liquidate a few remaining investments to pay Think Finance, the parties and their respective counsel scheduled a due diligence examination of the debtor's financial books and records at 7515 Lemmon Avenue, Hangar R, Dallas, Texas 75209.  Haynes himself did not personally participate but sent "his CFO" Randy Crawford.

    **44.**    At the due diligence examination on July 12, 2019, Randy Crawford produced a single notebook containing copies of various notes and spreadsheets which he represented were documentation of all the investments into which Think Finance's monies were invested.

    **45.**    At the due diligence examination, Randy Crawford admitted that the representations in the Original Note and the Amended Note that Haynes Investment, Inc. is a Texas corporation are false and claimed that, to his knowledge, there has never been an entity known as Haynes Investment, Inc.

    **46.**    At the due diligence examination, Randy Crawford refused to allow Think Finance to make copies or to take photographs of the contents of the notebook.  Subsequent to the due diligence examination, the undersigned attorney requested copies of the contents of the notebook on numerous; however, no such copies were provided.  Through his attorneys, Haynes also asserted that it is his position that the debt evidenced by the Amended Note is actually owed by Defendant Haynes Investments, L.L.C., and not by himself individually or by Haynes Investment, Inc.

**The 2014 SEP Investment**

47.     Think Finance's funding of the Original Note was deposited initially into an interest-bearing bank account at Wells Fargo.  Apparently, the first investment made by Haynes using these funds was to "2014 SEP Investment 2" on September 14, 2015, in the amount of $70,000.00.  Defendants did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.  Haynes insists that this investment was repaid; however, Think Finance is unable to locate any record of such repayment in the documents produced so far in discovery.  In accordance with the parties' agreement, such an investment should have borne interest at a minimum of 10% per year.

**The RJK Vending Loan & H&R Note**

48.     Through discovery in this case, Haynes has produced evidence of a loan of the Think Finance money to H&R, an business entity formed by Haynes originally as RJK Vending, L.L.C.  On December 3, 2015, Haynes advanced $494,910.00 to it purportedly to purchase tax stamps for tobacco products.  Subsequently, he personally signed a revolving line of credit promissory note dated March 1, 2016, in the maximum amount of $1,500,000 from H&R bearing interest at the rate of 10% with no maturity date and a default interest rate of 18% (the "H&R Note").  Haynes did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.

49.     H&R is a business venture between Haynes and a long-time business associate of his.  Its two members are Redlich and Haynes Investments, L.L.C.  From its inception, H&R was woefully undercapitalized.  Each of the two members only contributed $50 towards its capitalization.  Haynes did not tell Think Finance that he or his company was a member of H&R before the H&R Note was signed.

50.     According to a spreadsheet produced by Haynes in discovery $582,587.15 was owed under H&R Note as of May 29, 2019; however, the spreadsheet does not account for interest accrued or paid under the H&R Note.  Moreover, certain entries on the spreadsheets are incorrect.  Correcting these errors and adjusting for interest, over $850,000.00 remains due and owing from H&R and Think Finance is entitled to more than $175,000.00 in interest paid to date.

**Just Plane Maintenance**

51.     According to documents produced by Haynes in discovery, one of the investments into which he invested Think Finance's funds was a factoring loan to "Just Plane Maintenance." A business with that name operates out of the same Hangar R where Defendants office.  Haynes did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.

52.     According to a spreadsheet produced by Haynes in discovery, he advanced $97,980.00 in connection with this investment and received $102,480.40 in payments.  Think Finance is entitled to 50% of the interest paid of $4,500.40, net of taxes paid if any.

**The Spirit Notes**

53.     Through discovery in this case, Haynes has produced documents concerning three separate notes from Spirit International Inc., (the "Spirit Notes").  This investment relates to an LED lighting company in Carrollton, Texas.  Haynes did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.

54.     One of the Spirit Notes is a revolving line of credit promissory note dated March 17, 2016, in the maximum amount of $150,000 bearing interest at the rate of 12% with a maturity date of March 3, 2017, and a default interest rate of 18%.

55.     The second of the Spirit Notes is a revolving line of credit promissory note dated April 13, 2016, in the maximum amount of $225,000 bearing interest at the rate of 17.5% with a maturity date of July 11, 2017, and a default interest rate of 17.5%.

56.     The third of the Spirit Notes is purportedly in the maximum amount of $300,000 was not presented for inspection.

57.     According to a spreadsheet produced by Haynes in discovery, he has received $694,022.84 in payments toward the Spirit Notes, and the balance owed by Spirit is $27,432.66, plus additional accrued interest, which is personally guaranteed by Stewart.

58.     Think Finance is entitled to 50% of the net interest paid of $19,022.84, plus 50% of the balance remaining to be paid on the Spirit Notes, net of taxes paid if any.

**The Srills Loans & Note**

59.     Through discovery in this case, Haynes has produced evidence of a loan of the Think Finance money to Srills, an business entity of which Haynes was a member.  On March 31, 2016, Haynes advanced $37,215.71 to it.  Haynes has produced a revolving line of credit promissory note dated March 1, 2017, in the maximum amount of $1,000,000 from Srills, L.L.C. bearing interest at the rate of 10% with no maturity date and a default interest rate of 18% (the "Srills Note").  This investment purports to relate to a natural pesticide company.  Haynes      did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.

60.     According to a spreadsheet produced by Haynes in discovery, $1,213,564.53 was advanced under the Srills Note, and he received $135,919.78 in payments on the Srills Note. Pursuant to the terms of the Srills Note, all of the payments reflected on the spreadsheet should constitute interest paid on the Srills Note. Think Finance is entitled to 50% of the interest paid of

$135,919.78, plus 50% of the interest remaining to be paid on the Srills Note, net of taxes paid if any.

61.     Srills, L.L.C. is a Minnesota limited liability company which has been inactive and was administratively terminated on March 16, 2018.  Haynes and Jeremy Rounsville were its members.  Haynes did not tell Think Finance that he was a member of H&R before the Srills Note was signed.  Haynes has recently represented to Think Finance that Rounsville previously conveyed his interest in Srills to Haynes.  He has also testified that Rounsville embezzled money from Srills.

62.     After Srills was administratively terminated, more than $360,000 was advanced to Srills under the Srills Note.  Because Srills ceased to exist as a separate legal entity, Haynes is personally liable as a member of Srills for the debt incurred by Haynes ostensibly on its behalf after it was administratively terminated.

63.     Upon information and belief, Jeremy Rounsville has used the alias David Peterson.  Upon information and belief, Jeremy Rounsville registered "DAVID PETERSON" as a word mark (serial number 88266457) to be used for "cryptocurrency exchange services; cryptocurrency payment processing; cryptocurrency trading services; financial brokerage services for cryptocurrency trading; and financial consultation in the field of cryptocurrency." Upon information and belief, as David Peterson, Jeremy Rounsville operated a company called DPT Innovations, L.L.C/ d/b/a Arbitraging.co, a fictitious entity purportedly based in Singapore. As David Peterson, Jeremy Rounsville has been accused of operating this company as a cryptocurrency Ponzi scheme.

64.     In July 2019, Randy Crawford expressly represented that Srills has continued to do business and was, even then, in the process of securing vendor agreements with Wal-Mart and Tractor Supply.

65.     The Srills Note is purportedly secured by "all assets and funds owned or held by the Borrower."  A few days before the date of the Srills Note, Haynes formed Srills Technology and subsequently transferred all of Srills' intellectual property into Srills Technology. Subsequently, Haynes claims that he took control of all of the remaining assets of Srills, and transferred such assets to a new company named SafeDecide.  SafeDecide has purportedly assumed liability for the unpaid Srills Note.  In essence, Haynes loaned $1.2 million of Think Finance's funds to his own company, looted that company of its valuable intellectual property, and transferred all of its remaining assets to a new company that he owns and controls without telling Think Finance.

**The Tangent Gaming Note**

66.     Through discovery in this case, Haynes has produced a revolving credit loan note dated May 1, 2016, in the maximum amount of $400,000 from Tangent Gaming TX, L.L.C., bearing interest at the rate of 10% with no maturity date and a default interest rate of 18% (the "Tangent Gaming Note").  This investment relates to a business that purchased used gaming machines to be placed at a casino with the Apache Tribe of Oklahoma.

67.     Defendants did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.  This investment is similar to the one investment that Haynes did present to Think Finance, and which Think Finance rejected.

68.     Haynes signed the note as the manager of Tangent.  Haynes did not tell Think Finance that he was the manager of Tangent before the Tangent Gaming Note was signed.

69.     According to a spreadsheet produced by Haynes in discovery, $340,490 was advanced to Tangent under the note, and it has never made a single payment.  The Tangent Gaming Note purports to be secured by all assets and funds owned or held by Tangent.

**The YNS Debt**

70.     In 2017, Plaintiff's representatives were told by Haynes and his representatives that an investment in the amount of $395,000 was made in an investment known as YNS (the "YNS Debt"), which Haynes represented is a development company that develops multi-family housing and other projects.  Haynes represented that this investment was bearing interest at the rate of 10% per annum.  Haynes produced no document pertaining to this investment.  As the designated representative of YNS, Haynes has testified that it was an "oral" note with an interest rate of 10%.  Haynes did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.

71.     When Randy Crawford was questioned about this particular investment, he stated that he was not able to discuss this investment with Think Finance's representatives, indicating that he was under an "NDA."  Haynes contends that this investment has been repaid in full and is now closed.  Haynes has not accounted for the interest, fees, dividends and capital appreciation earned by the invested principal (net of taxes) so that Think Finance can calculate the 50% owed to it under the notes.

72.     There are three separate "YNS" entities.  YNS is a Delaware company owned by Haynes's spouse Yvonne.  YNS-GC is a Texas limited liability company whose members are Haynes and Yvonne Hopen.  YNS-LP is a Texas limited partnership, whose general partner is YNS.

73.     From documents produced in discovery, it appears Haynes loaned approximately $750,000.00 to YNS from late 2016 through 2017.  YNS used this money to develop a multi-unit condominium project in Dallas known as the Hudson project.  This "oral" note using Think Finance money was a primary source of funding used by YNS in the developing the Hudson project.  During this time, YNS used commingled funds in its bank account, which included money from the "oral" note to form YNS-GC.  As Think Finance began asking questions the YNS investment, Haynes formed YNS-LP and caused title to the Hudson project real property to be transferred into YNS-LP.

**Vast Display Networks**

74.     According to documents produced by Haynes in discovery, one of the investments into which he invested Think Finance's funds was "Vast Display Network."  Haynes did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.

75.     According to a spreadsheet produced by Haynes in discovery, he advanced $12,500.00 in connection with this investment and received $17,106.14 in payments.  Think Finance is entitled to 50% of the interest paid of $4,606.14, net of taxes paid if any.

**SAAH Management Services**

76.     According to documents produced by Haynes in discovery, one of the investments into which he invested Think Finance's funds was a revolving line of credit note dated November 1, 2016, signed by Haynes himself as a member of SAAH (the "SAAH Note").  Haynes did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.

77.     According to a spreadsheet produced by Haynes in discovery, he advanced $239,484.96 in connection with this investment and received $239,708.82 in payments.  Think Finance is entitled to 50% of the interest paid of $223.86, net of taxes paid if any.  In addition, it does not appear that Haynes collect the full 12% interest specified in the SAAH Note.  Think Finance is entitled to 50% of the uncollected amounts due and owing under the SAAH Note, net of taxes paid.  In addition, Haynes appears to have given payment credit to SAAH for payments which were not actually payments by SAAH on the SAAH Note such as a $50,000 payment purportedly made on September 11, 2017, coded as "Haynes Investments Legal Fees."

## 2H Lending Management Services

78.     According to documents produced by Haynes in discovery, one of the investments into which he invested Think Finance's funds was a revolving line of credit note dated September 12, 2017, signed by Haynes himself as the manager of 2H Lending Management Services, L.L.C. (the "2H Note").  Haynes did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.

79.     According to a spreadsheet produced by Haynes in discovery, he advanced $900,000.00 in connection with this investment and received $910,000.00 in payments.  Think Finance is entitled to 50% of the interest paid of $10,000.00, net of taxes paid if any.  In addition, it does not appear that Haynes collected the full 10% interest specified in the 2H Note.  Think Finance is entitled to 50% of the uncollected amounts due and owing under the 2H Note, net of taxes paid.

## The Haynes Investments, L.L.C. Note

80.     According to documents produced by Haynes in discovery, one of the investments into which he invested Think Finance's funds was a revolving credit loan note dated October 1,

2016, signed by Haynes himself on behalf of Haynes Investments, L.L.C. payable to Haynes Investments, L.L.C. in the principal amount of $500,000.00 with interest at the rate of 10 percent per annum (the "Haynes Investments, L.L.C. Note").  Haynes did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.

81.     According to a spreadsheet produced by Haynes in discovery, he advanced $2,616,307.97 in connection with this investment and received $2,657,680.61 in payments. A true and correct copy of this spreadsheet is attached to this petition as Exhibit C.  It is apparent that Haynes used these funds as a personal piggy bank, transferring $55,000.00 directly to himself, using $290,000.00 for something he calls the "Hudson Project," and even using $15,00 for a fuel tank repair of a corporate jet he owns through another company N73CL.

82.     Before discovery in this case, Haynes never mentioned or produced the Haynes Investments, L.L.C. Note or spreadsheet.  Interestingly, the spreadsheet itself bears the date December 6, 2019—well after discovery was served in this case and a mere five days before it was produced in discovery.  A reasonable inference from the available evidence is that Defendants fabricated the Haynes Investments, L.L.C. Note and spreadsheet after the fact to "paper" the use of Think Finance's funds as a personal piggy bank for Haynes and his companies rather than for investments in tribal-related industry investments.

**The CSB/Daugomah Note**

82.     Through discovery in this case, Haynes has produced a promissory note dated February 20, 2017, in the face amount of $300,000 from John Daugomah and CSB Enterprises L.L.C. bearing interest at the rate of 4% with a maturity date of September 20, 2019, and a default interest rate of 15% (the "CSB/Daugomah Note").  This investment purports to relate to the Crown Point Hotel being built on tribal lands.

84.     Haynes did not present this proposed investment to Think Finance for approval, and Think Finance did not approve this investment.

85.     The CSB/Daugomah Note has matured and is now due.  Total interest due at maturity was $31,000.00.  Think Finance is entitled to 50% of all interest (net of taxes) pursuant paragraph 1(b) of the Amended Note.

86.     All conditions precedent have been performed or have occurred.

### VIII.
### CAUSES OF ACTION

**Suit on Note**

87.     Think Finance is the holder of the Amended Note.  Although Haynes signed the Amended Note in a representative capacity for "Haynes Investment, Inc., a Texas corporation," there is no such Texas corporation.   Through his attorney, Haynes contends that Haynes Investments, L.L.C. is the true maker of the Amended Note.  Think Finance presented its claim for payment, and neither Haynes nor Haynes Investments, L.L.C. has paid the just amount owed. Think Finance requests that this court enter judgment in its favor and against Haynes and Haynes Investments, L.L.C. for the principal balance owed of $2,107,413, together with 50% of all interest, fees, dividends and capital appreciation earned by the invested principal (net of taxes).

**Accounting**

88.     In lieu of interest, the Amended Note requires Haynes and/or Haynes Investments, L.L.C. to pay Think Finance 50% of all interest, fees, dividends and capital appreciation earned by the invested principal (net of taxes).  Think Finance lacks sufficient information to determine this amount.  In accordance with the terms of the Amended Note, Think Finance gave credit for a management fee with respect to such investments.  Accordingly, this agreement creates a formal or informal fiduciary relationship pursuant to which Haynes

owes a fiduciary duty to account to Think Finance for the all interest, fees, dividends and capital appreciation earned by the invested principal and for the taxes paid in connection with such investments. Accordingly, Think Finance requests that this court order a complete accounting of all investments made by Haynes and/or Haynes Investments, L.L.C. using the Think Finance funds from the Original Note and the Amended Note, and a calculation of 50% of all interest, fees, dividends and capital appreciation earned by the invested principal (net of taxes).

89.     Pursuant to Rule 172 of the Texas Rules of Civil Procedure, the court has authority to appoint an auditor or auditors to state the accounts between the parties and to make report to the court as soon as possible. Think Finance requests that the court appoint such an auditor and award reasonable compensation to such auditor to be taxed as costs of suit.

**Breach of Fiduciary Duty**

90.     Haynes agreed to manage the investments of the Think Finance funds from the Original Note and the Amended Note in tribal-related industry investments, and charged Think Finance a $300,000 management fee with respect to such investments. Haynes further agreed to present all proposed investments to Think Finance for approval. This agreement creates a formal or informal fiduciary relationship pursuant to which Haynes owes Think Finance fiduciary duties of full disclosure and loyalty.

91.     Haynes breached these fiduciary duties by not presenting the proposed investments to Think Finance for approval, by "investing" the funds in multiple business entities owned in whole or in part by Haynes himself, and one owned by his wife, and by not accounting for such investments. Notably, with respect to the few investments Haynes made in business entities not owned by himself or his wife, the individual owners of such companies were either

co-makers or guarantors whereas with respect to his own business entities, there are no individual guarantors.

    **92.**    As a result of his breach of fiduciary duties, Think Finance seeks forfeiture of the $300,000 management fee.  In addition, Think Finance has been damaged to the extent that Think Finance funds were invested in business entities owned by himself or his wife, and those funds are not repaid by such business entities.  Under these facts and circumstances, Haynes should be personally liable for 100% of all principal and 50% of all interest, fees, dividends and capital appreciation (net of taxes) earned by the principal invested in any business owned in whole or in part by Haynes or his immediate family.

**Fraudulent Inducement**

    **93.**    Haynes induced Think Finance to loan him $5,269,000 with the false representation that the loan was being made to Haynes Investment, Inc., a Texas corporation, with a lengthy successful track record of facilitating investments in tribal related industries. Haynes represented to Think Finance its monies would be invested in tribal related industries and, in the Amended Note, that its monies had in fact been invested in tribal related industries. In actuality, much of Think Finance's monies were invested in various business enterprises owned by Haynes himself or his cronies, including his wife and long-time business associates. Like Haynes Investment, Inc., one of these business entities—Srills—no longer exists as a legal entity.  Because of its previous relationship with Haynes, Think Finance justifiably relied on these representations to its detriment in making the loan evidenced by the Original Note and the Amended Note.  To the extent that Think Finance is unable to recoup all of the money advanced, Think Finance has sustained actual damages as a proximate result of such representations.  Think Finance asks that the court award actual damages against Haynes, as well as exemplary damages

for fraud against Haynes, for such fraudulent inducement, and estop Haynes from denying individual, personal liability on the Amended Note.

**Assumpsit / Money Had & Received (against H&R, Redlich, & Haynes Investments, L.L.C.)**

94.     Think Finance's money was invested into H&R without approval and such money has not been repaid.  H&R holds money which in equity and good conscience belongs to Think Finance.  Think Finance seeks judgment against H&R and Redlich only for the outstanding balance owed as a result of the RJK Vending Loan and H&R Note.

95.     The company form of H&R should be disregarded in this instance.  Redlich and Haynes Investments, L.L.C. deliberately undercapitalized H&R by making capital contributions of only $50 each.  In essence, they used the company form of H&R as a sham to perpetrate a fraud on Think Finance by using Think Finance money, intended to be invested in tribal-related industries, instead into a risky joint business venture.   Accordingly, Redlich and Haynes Investments, L.L.C. should be jointly liable for the outstanding balance owed as a result of the RJK Vending Loan and H&R Note.

**Assumpsit / Money Had & Received (against Srills, Haynes, Rounsville, SafeDecide, & Srills Technology)**

96.     Think Finance's money was invested into Srills without approval and such money has not been repaid.  Srills holds money which in equity and good conscience belongs to Think Finance.  Think Finance seeks judgment against Srills, Rounsville, SafeDecide and Srills Technology only for the outstanding balance owed as a result of the Srills Loan and Srills Note.

97.     Because Think Finance money was invested into Srills after it was administratively terminated, Haynes and Rounsville as officers, directors, and managers of Srills are personally liable for advanced made to Srills after March 16, 2018.

---

98.     All assets of Srills were transferred into Srills Technology and SafeDecide by Haynes without reasonably adequate compensation.  At the time of these transfers, advances had been made to Srills of Think Finance money, and all assets of Srills were to be pledged as collateral to repay such advances.  Because Haynes had actual knowledge of this security interest, all assets of Srills Technology and SafeDecide remain subject to the Srills Note.  To the extent necessary, Think Finance requests that the court impose a constructive trust against all assets of Srills Technology and SafeDecide to secure repayment of outstanding balance owed as a result of the Srills Loan and Srills Note.

**Assumpsit / Money Had & Received (against Tangent)**

99.     Think Finance's money was invested into Tangent without approval and such money has not been repaid.  Tangent holds money which in equity and good conscience belongs to Think Finance.  Think Finance seeks judgment against Tangent only for the outstanding balance owed as a result of the Tangent Gaming Note.

**Assumpsit / Money Had & Received (against Assumpsit / Money Had & Received (against YNS, YNS-GC, YNS-LP, Haynes, & Yvonne)**

100.     Think Finance's money was invested into YNS without approval and such money has not been repaid.  YNS holds money which in equity and good conscience belongs to Think Finance.  Think Finance seeks judgment against YNS, YNS-GC, YNS-LP, and Yvonne only for the amounts owed as a result of the YNS Debt.

101.     The company form of YNS should be disregarded in this instance.  Haynes and Yvonne used the company form of YNS as a sham to perpetrate a fraud on Think Finance by using Think Finance money, intended to be invested in tribal-related industries, instead into a their own real estate development company.  Haynes purports to have invested Think Finance's money into his own company, Haynes Investments, L.L.C., pursuant to a revolving line of credit

note he kept secret from Think Finance until discovery in this case.  This note reflects that it is from Haynes Investments, L.L.C. to Haynes Investments, L.L.C.  Haynes then purports to have used this revolving line of credit to make an "oral" note from Haynes Investments, L.L.C. to his wife Yvonne's company, YNS.  YNS then used this money to develop the Hudson project.  He and Yvonne then insured that title to the real property which constitutes the Hudson project was conveyed to YNS-LP.  They then formed YNS-GC as a separate entity in order to provide a vehicle through which to funnel payments to one of Yvonne's relatives hired as a project manager.  Accordingly, Haynes and Yvonne should be jointly liable for the outstanding balance owed as a result of the YNS Debt.

102.    YNS-GC and YNS-LP were formed by YNS with commingled money which primarily consisted of Think Finance money invested into YNS.  Real property which constitutes the Hudson project was conveyed to YNS-LP.  Under the Original Note, Think Finance is entitled to 50% of all interest, fees, rents, royalties, dividends, and capital appreciation earned by the invested principal (net of taxable paid), less any amounts paid as interest.  Accordingly, Think Finance is entitled to 50% of the appreciation on the Hudson project as a result of the investment made.

**Assumpsit / Money Had & Received (against SAAH)**

103.    Think Finance's money was invested into SAAH without approval and such money has not been repaid.  SAAH holds money which in equity and good conscience belongs to Think Finance.  Think Finance seeks judgment against SAAH only for the outstanding balance owed as a result of the SAAH Note.

**Assumpsit / Money Had & Received (against N73CL)**

104.    Think Finance's money was invested into N73CL for repairs and service to an airplane owned by N73CL without approval and it appears such money has not been repaid. N73CL holds money which in equity and good conscience belongs to Think Finance.  Think Finance seeks judgment against N73CL only for amounts advanced for repairs and service to the airplane owned by N73CL.

**Assumpsit / Money Had & Received (against 2H Lending)**

105.    Think Finance's money was invested into 2H Lending without approval and such money has not been repaid.  2H Lending holds money which in equity and good conscience belongs to Think Finance.  Think Finance seeks judgment against 2H Lending only for the outstanding balance owed as a result of the 2H Note.

**Assumpsit / Money Had & Received (against Daugomah & CSB)**

106.    Think Finance's money was invested with Daugomah and CSB without approval and such money has not been repaid.  Daugomah and CSB hold money which in equity and good conscience belongs to Think Finance.  Think Finance seeks judgment against Daugomah and CSB, jointly and severally, only for the outstanding balance owed as a result of the CSB/Daugomah Note.

**IX.**
**ATTORNEY FEES**

107.    It was necessary for Think Finance to retain attorneys of the law firm Bennett, Weston, LaJone & Turner, P.C. to prosecute its claim for collection of the Amended Note.  The Amended Note expressly provides that maker promises to pay all out-of-pocket costs and expenses including attorney fees incurred by the holder in connection with the collection and/or enforcement of the note.  Think Finance presented its claim to Haynes for payment more than

thirty days before filing this suit.  Think Finance is entitled to an award of reasonable and necessary attorney fees pursuant to the express terms of the Amended Note and pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.

## <u>PRAYER</u>

Think Finance prays that this Court award judgment in its favor against Defendants Haynes and Haynes Investments, L.L.C. for $2,107,413, together with 50% of all interest, fees, dividends and capital appreciation earned by the invested principal (net of taxes) due under the Amended Note, plus post-judgment interest as provided by law.  Think Finance prays that this Court award judgment in its favor against the other Defendants as requested in this amended petition.  Think Finance prays that the Court order an accounting and appoint an auditor as soon as possible to determine the 50% of all interest, fees, dividends and capital appreciation earned by the invested principal (net of taxes) due.  Think Finance prays that the Court order that the management fee of $300,000 is forfeited and that award that amount in addition to Think Finance.  Think Finance prays for reasonable and necessary attorney fees and for all costs of court including the reasonable compensation of the auditor requested herein.  Think Finance prays for general relief.

Respectfully submitted,

*/s/ John M. Frick*

_____

**John M. Frick**
State Bar No. 07455200
*jfrick@bennettweston.com*

**BENNETT, WESTON, LAJONE & TURNER, P.C.**
1603 LBJ Freeway, Suite 280
Dallas, Texas  75234
Tel:     (972) 662-4901
Fax:    (214) 393-4043

**ATTORNEYS FOR PLAINTIFF
THINK FINANCE, L.L.C.**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Plaintiff's Second Amended Complaint was served on the following attorneys of record on this the 6th day of  April, 2020 in accordance with the Texas Rules of Civil Procedure:

David A. Walton                             Mason G. Jones
Bell Nunnally & Martin, LLP                 Bell Nunnally & Martin, LLP
2323 Ross Ave., Ste 1900                    2323 Ross Ave., Ste 1900
Dallas, TX  75201                           Dallas, TX  75201
Via EFM: dwalton@bellnunnally.com           Via EFM: mjones@bellnunnally.com


 _/s/ John M. Frick_____
**John M. Frick**

# EXHIBIT A

## AMENDED AND RESTATED PROMISSORY NOTE

$5,269,000                                          Originally Dated: June 18, 2015
                                                   Amended and Restated as of
                                                   October 20, 2017.

FOR VALUE RECEIVED, HAYNES INVESTMENT, INC., (hereinafter referred to as the **"Borrower"**) promises to pay to the order of THINK FINANCE, LLC, a Delaware limited liability company (the **"Holder**), the principal sum of FIVE MILLION TWO HUNDRED SIXTY-NINE THOUSAND DOLLARS ($5,269,000), lawful money of the United States of America, or such lesser amount as shall be outstanding from time to time (the **"Principal Amount"**), together with interest accrued thereon, at the rate and on the terms set forth below.

### 1. PAYMENT OF PRINCIPAL AND RETURNS ON INVESTMENT.

(a) Payment of Principal. The Principal Amount shall be due and payable (i) on June 15, 2019 (the **"Maturity Date"**) or (ii) if earlier, upon a Mandatory Prepayment Event (as defined in Section 2), except as otherwise set forth herein. Borrower shall be entitled to a discount (the "Discount") against the Principal Amount, in the maximum amount of $269,000, equal to the amount that the Borrower foregoes by redeeming its Plain Green Note (defined below) earlier than its stated maturity date in order to make the Mandatory Prepayments in paragraph 2(b) below. The Discount and Management Fee (defined below) will be deducted from the outstanding Principal Amount to be paid on the Maturity Date.

(b) Payment of dividends, fees, interest and capital appreciation. Monies have been invested by Borrower in tribal related industries. In consideration of the Principal Amount owed to Holder under this Note, until the Note is paid in full, Holder shall be entitled to receive 50% of all interest, feesand dividends earned by the invested principal (net of taxes paid). Such payment will be made to Holder by Borrower on the Maturity Date.

(c) Interest; No Usurious Payments. Notwithstanding anything to the contrary contained herein or in any other document executed in connection herewith, the effective rate of interest hereunder shall not exceed the maximum effective rate of interest permitted by applicable law or regulation.

(d) Place and Method of Payment. Payments of principal and interest and any other amounts due under this Note shall be paid to the Holder at the Holder's address of record as shown on the Note Register (as defined in Section 5 of this Note) or such other location designated by the Holder in writing to Borrower from time to time, and shall be made in currency of the United States of America as at the time of payment shall be legal tender for payment of public and private debts. Beginning February 1, 2018, the Borrower will pay to Holder all amounts received by Borrower as holder of the Plain Green Note (defined below).

(e) Business Day. If the date on which any payment required to be made under this Note occurs on a day other than a Business Day, such payment shall be due and payable on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment.

(f) Security. This Note is secured solely by the rights to the Borrower (i) to amounts payable to the Borrower under a certain Promissory Note, dated June 18, 2015, between the Borrower and

Plain Green, LLC, a tribally-owned entity organized and existing under the laws of the Rocky Boy's Indian Reservation, Montana (the "**Plain Green Note**") and (ii) earnings or losses on funds derived from (i). In the Event of Default, Borrower agrees to forward any repayment the Borrower receives on the Plain Green Note directly to the Holder.

### 2. PREPAYMENT OF THIS NOTE.

(a) Optional Prepayment. The Borrower may prepay all or a part of the outstanding Principal Amount without penalty or premium at any time without penalty.

(b) Mandatory Prepayments.    Each of the following shall constitute a "**Mandatory Prepayment Event**": (1) the Borrower shall pay to Holder: on October 20, 2017, the amount of $800,000; on November 20, 2017, the amount of $800,000; and on December 20, 2017, the amount of $400,000; and (2) upon the occurrence of an Event of Default that is continuing, the Borrower shall (without any action being required of the Holder) immediately repay all Principal Amount and accrued and unpaid interest then outstanding under this Note.

### 3. APPROVAL OF INVESTMENTS:

(a) Borrower shall present to Holder ALL proposed investments of the principal. Holder has the right to deny any proposed investment for any reason.

(b) If Holder agrees to the proposed investment then Borrower will make the investment and:

(i)    The returns earned on the investment will be split 50%/50% each between Borrower and Holder. The Borrower and Holder will mutually decide how the current earnings will be managed, *i.e.*, either paid out or reinvested.

(ii)    Any losses by way of the investment will be non-recourse to the Borrower. All losses will be netted against gains prior to any distributions of returns and any repayment of principal on maturity date.

### 4. EVENTS OF DEFAULT. The following shall be an "**Event of Default**" hereunder:

The failure of Borrower to observe or perform any material term, condition, agreement, covenant or provision or the breach of any representation or warranty, contained in this Note and, if capable of being promptly cured, the continued failure of the Borrower to observe or perform any such term, condition, agreement, covenant or provision or cure any such breach for thirty (30) days after the Holder or other applicable party gives notice to Borrower thereof;

### 5. REMEDIES ON DEFAULT; NO WAIVER; ETC.

In case any one or more Events of Default shall occur and be continuing, the Holder may (i) at its election declare the entire unpaid balance of principal and all other sums due under this Note to be immediately due and payable upon notice or demand (in which case, from and after an Event of Default, the unpaid balance of principal and all other sums due from the Borrower to the Holder shall also be immediately due and payable); and (ii) immediately and without demand exercise or cause to be exercised any rights and remedies provided in this Note or which may be available to the Holder at law, in equity, by statute, or otherwise, without further stay, any law, usage or custom to the contrary notwithstanding.

2

### 6. NOTICES, ETC.

All notices, waivers and other communications provided for hereunder shall be in writing, and shall be deemed to be given (a) when delivered, if delivered by hand (with written confirmation of receipt) or by telecopy (as evidenced by receipt of a confirmation), (b) one Business Day after sending, if sent by nationally recognized overnight delivery specifying next day delivery (with written confirmation of receipt), or (c) three (3) days after depositing in the mails, if sent by certified mail with return receipt requested. All such notices, waivers and other communications shall be addressed to the party at the address next to their name at the beginning of this Note or, in each case, to such other addresses as shall be specified by notice.

### 7. COSTS AND EXPENSES.

The Borrower shall reimburse Holder upon demand, for all reasonable out-of-pocket costs and expenses incurred in connection with the collection and/or enforcement of this Note or any amounts payable pursuant hereto or with respect to any litigation or controversy arising from this Note (including, without limitation, attorneys' fees) whether or not suit is actually instituted.

### 8. GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL.

THIS NOTE AND ALL RELATED INSTRUMENTS AND AGREEMENTS WILL BE DEEMED TO BE MADE IN THE STATE OF TEXAS. THIS AGREEMENT WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ITS CONFLICT OF LAWS RULES. THE BORROWER HEREBY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, PROVIDED THAT NOTHING CONTAINED IN THIS AGREEMENT WILL PREVENT THE HOLDER FROM BRINGING ANY ACTION, ENFORCING ANY AWARD OR JUDGMENT OR EXERCISING ANY RIGHTS AGAINST THE BORROWER INDIVIDUALLY, AGAINST ANY SECURITY OR AGAINST ANY PROPERTY OF THE BORROWER WITHIN ANY OTHER COUNTY, STATE OR OTHER FOREIGN OR DOMESTIC JURISDICTION. THE HOLDER AND THE BORROWER AGREE THAT THE VENUE PROVIDED ABOVE IS THE MOST CONVENIENT FORUM FOR BOTH THE HOLDER AND THE BORROWER. THE BORROWER WAIVES ANY OBJECTION TO VENUE AND ANY OBJECTION BASED ON A MORE CONVENIENT FORUM IN ANY ACTION INSTITUTED UNDER THIS AGREEMENT.

EACH OF THE BORROWER AND THE HOLDER IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE BORROWER AND THE HOLDER ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

### 9. SUCCESSORS AND ASSIGNS.

This Note may be assigned or transferred by the Holder to any person or entity. The Borrower may not assign or transfer this Note or any of its rights hereunder without the prior written consent of the Holder.

3

10. <u>MANAGEMENT FEE</u>.  Borrower will earn a 2% per annum management fee through June 2018 based upon the average amount invested for the prior 12 months. The fee will be paid in arrears.   Such Management Fee is $300,000 over the term of the management agreement and will be paid on June 15, 2019 through the deduction set forth in paragraph 1(a) above.

## 11. MISCELLANEOUS.

The provisions of this Note shall inure to the benefit of and shall be binding upon the Borrower and the Holder, and their respective heirs, legal representatives, successors and permitted assigns.  If any term, provision, covenant or restriction of this Note is held by a court or a governmental agency of competent jurisdiction to be invalid, void or unenforceable, or to cause any party to be in violation of any applicable provision of law, the remainder of the terms, provisions, covenants and restrictions of this Note shall remain in full force and effect and in no way shall be affected, impaired or invalidated.  This Note may not be amended or supplemented except in a writing signed by the Borrower and the Holder.  No course of dealing and no failure on the part of the Holder to exercise, and no delay in exercising, any right hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any right hereunder or under this Note preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any other remedies provided by law, in equity or otherwise.  This Note and the other documents referred to herein contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior or contemporaneous understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. **The Borrower hereby waives presentment, demand, protest, notice of protest, dishonor and all other notices or requirements of any kind, except as otherwise expressly required herein.  The Borrower hereby waives all laws exempting real or personal property from execution.**

WITNESS WHEREOF, the parties hereto have caused this Note to be executed by their respective duly authorized representatives, as of the date first written.

**BORROWER**                                    **HOLDER**

HAYNES INVESTMENTS, INC., a          THINK FINANCE, LLC, a
Texas Corporation                             Delaware limited liabiity company

By: _____        By: _____
Name: _L. Stern Haynes_               Name: _Barney C Brigg_
Title: _Managing Director_            Title: _CFO_

4

KIMETRA BRICE, ET AL. vs KENNETH REES, ET AL.
Attorneys Eyes Only          L. Steven Haynes on 02/12/2021

```
 1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
 2
     KIMETRA BRICE, EARL BROWNE,    )   Case No.
 3   and JILL NOVOROT,              )   3:19-cv-01200-WHO
                                    )
 4        Plaintiffs,               )
                                    )
 5   VS.                            )
                                    )
 6   KENNETH REES; GPL SERVICING,   )
     LTD.; PLAIN GREEN, LLC; GREAT  )
 7   PLAINS LENDING, LLC; VICTORY   )
     PARK CAPITAL ADVISORS, LLC;    )
 8   VICTORY PARK MANAGEMENT, LLC;  )
     SCOTT ZEMNICK; JEFFREY         )
 9   SCHNEIDER; THOMAS WELCH;       )
     HAYNES INVESTMENTS, LLC;       )
10   and L. STEPHEN HAYNES,         )
                                    )
11        Defendants.               )

12

13   ********************************************************

14           ORAL AND VIDEOTAPED DEPOSITION OF
             L. STEVEN HAYNES, INDIVIDUALLY,
15          AND AS THE CORPORATE REPRESENTATIVE
                 OF HAYNES INVESTMENTS
16
                   APPEARING REMOTELY
17
                   FEBRUARY 12, 2021
18
          *CONFIDENTIAL - ATTORNEYS' EYES ONLY*
19
     ********************************************************
20

21

22

23

24

25
```

DEFENDANT'S
EXHIBIT
**5**

**KIMETRA BRICE, ET AL. vs KENNETH REES, ET AL.**

**Attorneys Eyes Only**  L. Steven Haynes on 02/12/2021  **Pages 2..5**

---

Page 2

```
1              REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
2    L. STEVEN HAYNES, produced as a witness, appearing via
3    videoconference, at the instance of the Plaintiff, and
4    remotely duly sworn, was taken in the above-styled and
5    numbered cause on the 12th day of February, 2021, from
6    10:10 a.m. to 6:06 p.m., before Trashuna R. Salaam,
7    Certified Shorthand Reporter in and for the State of
8    Texas, reported by computerized stenotype machine,
9    pursuant to the Federal Rules of Civil Procedure, the
10   Texas Supreme Court's current Emergency Order regarding
11   the COVID-19 State of Disaster, and the provisions
12   stated on the record or attached hereto.
```

Page 4

```
1                        INDEX
2                                                    PAGE
3    Appearances...................................    2
4    L. STEVEN HAYNES
5        Examination by Ms. Haac..............    9
6    Reporter's Certificate......................   258
7    Signature and Changes.......................   260

9              DESIGNATED CONFIDENTIAL
10        PAGE    LINE
11        249      13
12        250      13
13        251      14
14        251      23
```

---

Page 3

```
1                  REMOTE APPEARANCES
2    FOR THE PLAINTIFFS:
         Ms. Anna Haac
3        TYCKO & ZAVAREEI, LLP
         1828 L Street, N.W., Suite 1000
4        Washington, DC 20036
         (202) 973-0900
5        ahaac@tzlegal.com
6    FOR THE DEFENDANTS:
         Mr. Michael Witsch
7        ARMSTRONG, TEASDALE, LLP
         2005 Market Street
8        One Commerce Square,29th Floor
         Philadelphia, PA 19103
9        (267) 780-2015
         mwitsch@armstrongteasdale.com
10
     ALSO PRESENT:
11       Ms. Leslie Rogers, Videographer
```

Page 5

```
1                       EXHIBITS
2    NO.  DESCRIPTION                                  PAGE
     133  Defendant L. Steven Haynes' Revised           70
3         Responses and Objections to Plaintiff
          Kimetra Brice's First Set of Interrogatories
4
     134  Letter of Intent:  Bates No. Haynes0001149    74
5         through Haynes0001154
     135  Email - Re: Tribal Summary                    98
6    136  Email:  Bates No. Haynes0002554              102
7         through Haynes0002557
8
     137  Email:  Bates No. Haynes0002570              123
9         Haynes0002571
10   138  Letter:  Bates No. Haynes0002594             132
          through Haynes0002603
11
     139  Email:  Bates No. Haynes0002566              136
12
     140  Term Sheet for Think Finance-Chippewa Cree   139
13        Transaction:  Bates No. Haynes0001155
          through Haynes0001158
14
     141  Email:  Bates No. Haynes0002583              142
15        through Haynes0002584
16   142  Credit Agreement:  Bates No. Haynes0000384   145
          through Haynes0000395
17
     143  Credit Agreement:  Bates No. Haynes0003179   146
18        through Haynes0003191
19   144  First Amendment to Credit Agreement:         146
          Bates No. Haynes0000396 - Haynes0000397
20
     145  Second Amendment to Credit Agreement:        148
21        Bates No. Haynes0000267 - Haynes0000268
22   146  Email:  Bates No. Haynes0002658              152
          through Haynes0002661
23
24   147  Email:  Bates No. Haynes0000475              156
25   148  Email:  Bates No. Haynes0000059              163
          through Haynes0000060
```

---

**www.huseby.com**        **Huseby, Inc.  Regional Centers**        **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

090

**KIMETRA BRICE, ET AL. vs KENNETH REES, ET AL.**

Attorneys Eyes Only          L. Steven Haynes on 02/12/2021          Pages 6..9

<table>
<tr><td colspan="2">

Page 6

```
 1          EXHIBITS (continued)
 2  NO.  DESCRIPTION                              PAGE
    149  Put Agreement:  Bates No. Haynes0001210   166
 3       through Haynes0001215
 4  150  Promissory Note:  Bates No. Haynes0001222  167
         through Haynes0001253
 5
    151  Wells Fargo Wire Transfer:               170
 6       Bates No. Haynes0003322 - Haynes0003326
 7  152  Email:  Bates No. Haynes0001525          174
 8  153  Email:  Bates No. Haynes0001895          183
 9  154  Email:  Bates No. TF-VA0549945           188
         through TF-VA0549946
10
    155  Email:  Bates No. TF-VA0527822           191
11       through TF-VA0527824
12  156  Email:  Bates No. TF-VA0537502           193
13  157  Email:  Bates No. TF-VA0411560           200
         through TF-VA0411567
14
    158  Email:  Bates No. TF-VA0171211           203
15       through TF-VA0171212
16  159  Email:  Bates No. TF-VA0537427           203
17  160  Email:  Bates No. TF-VA0169608           209
         through TF-VA0169612
18
    161  Email:  Bates No. TF-VA0168990           218
19
    162  Email:  Bates No. TF-VA0169278           220
20
    163  Email:  Bates No. TF-VA0169273           221
21
    164  HP Funding Website Printout              222
22
    165  HP Funding Website "About" Printout      224
23
    166  Email:  Bates No. Haynes0002214          227
24
    167  Think Finance Sovereign Nation Advocacy  228
25       Bates No. Haynes0002195 - Haynes0002209
```

</td></tr>
</table>

Page 7

```
 1          EXHIBITS (continued)
 2  NO.  DESCRIPTION                              PAGE
    168  Email:  Bates No. Haynes002669           231
 3       through Haynes Haynes0002670
 4  169  Email:  Bates No. STINSON_0009372        233
         through STINSON_009373
 5
    170  Email:  Bates No. Keenum_0002120         235
 6
    171  Brice v. Stinson Electronic File Exhibit  235
 7       Bates No. Keenum_0002121.XLSX
 8  172  TF Holdings Board of Directors Meeting:  240
         Bates No. 7HBF2_0004180 - 7HBF2_0004180
 9
    173  Promissory Note:  Bates No. Haynes0001255  242
10       through Haynes0001260
11  174  Email:  Bates No. Haynes0002671          246
         through Haynes0002674
12
    175  Haynes Investments, Inc. Invoice:        247
13       Bates No. Haynes0003246 - Haynes0003313
14  176  Email:  Bates No. GPLP00081912           254
         through GPLP00081915
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1  P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  This is the beginning
 3  of Media No. 1 in the deposition of L. Steven Haynes in
 4  the matter of Kimetra Brice, et. al versus Kenneth
 5  Rees, et. al., Case Number 3:18-cv-01200-WHO.
 6          Today's date is Friday, February 12th,
 7  2021, and the time is 10:10 a.m.  My name is Leslie
 8  Rogers.  I'm the videographer.  The court reporter is
 9  Trashuna Salaam.  We are here with Huseby Global
10  Litigation.
11          Counsel, please introduce yourselves,
12  after which the court reporter will then swear in the
13  witness.
14          MS. HAAC:  Anna Haac from the law firm of
15  Tycko & Zavareeli on behalf of plaintiffs in the
16  punitive class.
17          MR. WITSCH:  Good morning.  This is
18  Michael Witsch from Armstrong, Teasdale on behalf of
19  defendants L. Steven Haynes and Haynes Investments.
20          The WITNESS:  I'm L. Steven Haynes.
21          THE REPORTER:  Counsel --
22          THE VIDEOGRAPHER:  The court reporter will
23  swear in the witness, please.
24          Thank you.
25          THE REPORTER:  Mr. Haynes, would you
```

Page 9

```
 1  please raise your right hand, sir.
 2          (The witness was sworn.)
 3              L. STEVEN HAYNES,
 4  having been first duly sworn, testified as follows:
 5              EXAMINATION
 6  BY MS. HAAC:
 7      Q.  Good morning, Mr. Haynes.  So I know you've
 8  been deposed before, including in relation to this
 9  case.  Although have you been -- other than being
10  deposed with respect to the Think Finance litigation,
11  have you been deposed in other -- for any other
12  cases?
13      A.  I believe twice before.
14      Q.  And what were -- were those after your
15  deposition in the Think litigation?
16      A.  No, many years ago.
17      Q.  Okay.  What were those relating to?
18      A.  You know, I'm a little bit nervous.  I don't
19  remember.  I know that I've been in depositions before.
20  I was -- it will come to me.  If you don't mind, I'm
21  just getting composed.
22      Q.  Yeah, that's fine.
23          MS. HAAC:  Are you guys hearing that
24  sound?  Did you hear that beep?  I just want to make
25  sure it's not going to interrupt the -- I thought I
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

091

**Attorneys Eyes Only**        L. Steven Haynes on 02/12/2021        **Pages 238..241**

| Page 238 |
|---|

1  It didn't matter as long as it passed muster. And that
2  was -- that was the model.
3          After talking to a couple of tribes, there
4  was an attorney named Patrick McCoy, who was a Native
5  American attorney, represented the Pinoleville Tribe;
6  and Circle of Nations was created as a warehouse
7  lender.
8      Q. And what's Think's involvement with Circle of
9  Nations?
10     A. Think has no involvement with Circle of
11 Nations.
12     Q. How is that connected to your relationship
13 with Think Finance then?
14         MR. WITSCH: Objection to the form.
15         THE WITNESS: There is a -- the
16 Tunica-Biloxi Tribe, which is Mobiloans, was the first
17 and only client, so far, of Circle of Nations, and
18 borrows money from them for their lending business.
19     Q. (BY MS. HAAC) All right. So, in other words,
20 you helped Think Finance restructure its Mobiloan
21 portfolio, correct?
22         MR. WITSCH: Objection to the form.
23         THE WITNESS: There was no restructuring.
24 There was -- there was -- we provided -- created a
25 warehouse lending organization that was able to raise

| Page 239 |
|---|

1  capital to put out. And Mobiloans was interested in
2  borrowing the money. I don't know where their -- where
3  their capital went.
4      Q. (BY MS. HAAC) So you don't know what capital
5  Mobiloans was using previously to fund the loans?
6      A. I -- I don't -- I know they were part of the
7  Think Finance sphere. I don't know exactly where they
8  were getting their capital to loan. It wasn't me.
9      Q. And who provides the funds to Circle of
10 Nations?
11     A. The current -- the current lender to Circle of
12 Nations is a company out of New Work called
13 BasePoint.
14     Q. And are you -- how are you compensated in
15 connection with the Circle of Nations work?
16     A. They outsource some accounting work to me and,
17 I, you know, just help them with their books and
18 records.
19     Q. So "they" being the Circle of Nations
20 outsources accounting work to you?
21     A. Yeah, they do some work themselves; and some
22 work they outsource to me -- well, to a company that
23 I'm a member of.
24     Q. What's that company?
25     A. It's called SAAH, S-A-A-H.

| Page 240 |
|---|

1          MR. WITSCH: Anna, I apologize for
2  interrupting. But do you have any idea how much longer
3  you think you might want to go? I don't mean to slow
4  you down or anything, but I could use a break if it's
5  going to be a little while.
6          MS. HAAC: No, let's just take a break.
7          MR. WITSCH: Okay.
8          THE VIDEOGRAPHER: Off the record at 5:30
9  p.m.
10         (A break was taken.)
11         THE VIDEOGRAPHER: This is the beginning
12 of Media No. 6 in the deposition of L. Steven Haynes.
13 The time is 5:35 p.m. We are back on the record.
14     Q. (BY MS. HAAC) So you have a note with Think
15 Finance; is that right?
16     A. I did, yes.
17     Q. Let me just show you what I'm marking as
18 Exhibit 172. This is 7HBF2_0004180. It's a board of
19 directors meeting from TF Holdings, which you know is
20 the reorganized Think Finance, right?
21     A. I -- I do now. I didn't know what it was
22 called. I knew there was one.
23     Q. Okay. Oh, no, I thought I had -- so this --
24 if you see -- let me see.
25         This says Haynes note approximately -- do

| Page 241 |
|---|

1  you see in the footnotes of this page, which is Page
2  32, C -- under C?
3      A. I do.
4      Q. It says, "Haynes note (~1.38 million)."
5  What's that referring to?
6      A. That was -- you know what, I don't know.
7  That's not any number that I have seen before.
8      Q. Okay. It says, Deposits 46,000. Do you know
9  what that's referring to?
10     A. No.
11     Q. Deferred Lease 14,000?
12     A. No.
13     Q. What about MBL Note 6.8 million?
14     A. I don't -- I believe that -- I believe that
15 Mobiloan -- that Think had a note from Mobiloans.
16     Q. Relating to Circle of Nations at all?
17     A. No. I -- I -- when -- I believe it was -- had
18 to do with their original -- their original financing
19 of Mobiloans long before. I mean, I never had anything
20 to do with Mobiloans, but I do believe there's a legacy
21 Mobiloans debt.
22     Q. Okay. So that wasn't actually -- that's not
23 relating to you?
24     A. No. I don't think anything besides the
25 "Haynes Note" is related to me. After -- I don't think

**KIMETRA BRICE, ET AL. vs KENNETH REES, ET AL.**

**Attorneys Eyes Only**      L. Steven Haynes on 02/12/2021      **Pages 242..245**

---

Page 242

1  anything after that comment is.
2      Q.  Okay.  So just showing you Page 1 of Exhibit
3  150.
4      A.  Yes.
5      Q.  This is a note to Haynes Investments from
6  Plain Green for 4.269 million, right?
7      A.  That is correct.
8      Q.  And then you had a note to Think Finance for
9  5.269 million, correct?
10     A.  Correct.
11     Q.  Okay.  And that's this note Exhibit 173,
12  right?
13     A.  That looks correct, yes.
14     Q.  Okay.  And this is Haynes0001255.  So is --
15  are these two things together is what happened, that
16  Think loaned $5.2 million to Haynes Investments, and
17  that you then you loaned 4.2 million of that to Plain
18  Green?
19     A.  No, this is the -- no.  This is the unwinding
20  of the credit agreement between Plain Green and Haynes
21  Investment and Haynes Investments and Think Finance as
22  part of the termination of the agreements.
23          The -- Plain Green said they could not pay
24  a lump sum of $5.269 million back on June 18th of 2015.
25  So they agreed to pay a $1,000,000 down in cash and

---

Page 243

1  finance the rest, and I believe it was $180,000 monthly
2  installments.  And then I had a back -- a note to Think
3  Finance to repay them the $5.26 million that was being
4  repaid to Haynes Investments by Plain Green.  It was
5  the unwinding of the credit agreements.
6      Q.  So then you retained $1,000,000; is that
7  right?
8      A.  No.  There was -- I didn't retain a million
9  dollars.  It was -- they had already -- they paid me
10  cash as a down payment, but I still owed the full $5.26
11  million to Think Finance.  It's just they gave me a
12  million in cash and a $4,000,000 note; and I had a
13  $5,000,000 note with Think.  It was -- the numbers were
14  exact.
15     Q.  Right.  Plain Green gave you $1,000,000 in
16  cash.  You had a $5.2 million with Think, and I thought
17  the million dollars that you had in cash you were using
18  to pursue other investments?
19     A.  I was -- in my note with Think, yes, I was
20  allowed to invest that money.  But I owed $5,000,000 to
21  Think Finance, 5.269 million.
22     Q.  Right.  So you owed 5.2 million to Think
23  Finance.  Plain Green owed 4.2 million to you.  And
24  Plain Green paid you $1,000,000, which you owed to
25  Think Finance, but you used to invest in other things;

---

Page 244

1  is that right?
2      A.  That's correct.
3      Q.  Okay.  And what did you do with the
4  $1,000,000?
5      A.  I invested in tribal businesses, a cigarette
6  company, slot machines for a casino in Apache, various
7  investments.
8      Q.  Okay.  And have you now paid that $1,000,000
9  back?  You know, has the $5.2 million been paid to
10  Think Finance?
11     A.  Yeah.  So the transaction was as I was getting
12  the 180,000 a month plus interest for whatever is still
13  outstanding to Plain Green, I passed the 5 percent
14  interest through to Think Finance.  And on the maturity
15  date of the note, I was -- I was to pay Think Finance
16  $5.269 million.
17          The note was a non-recourse note, and I
18  had lost some money in the investments that we made.
19  Most of it was because in -- well, in 2000 -- the note
20  was maturing in '15, '16, '17 -- in the fall of '18,
21  Think Finance called, which was two years prior to
22  maturity -- maybe three years prior to maturity.  I
23  think 2021 was the original maturity date.  So they
24  called three years prior to maturity, and said, Hey, we
25  need as much money back as you can possibly pay us now.

---

Page 245

1  Let's amend the note.
2          So I called in as many of the loans that I
3  had made, and I was able to put together $2,000,000.
4  So in October of '18, I paid $2,000,000 down on the
5  5.6 -- $5.26 million note --
6          (Audio/video disruption.)
7          MS. HAAC:  Huh-oh, I think we lost you.
8          MR. WITSCH:  We lost your audio, Steven.
9          MS. HAAC:  You might have started
10 recording.
11          THE WITNESS:  Can you not hear me?  I
12 haven't touched anything.
13          MS. HAAC:  We can hear you now.
14          THE WITNESS:  Okay.  So I guess on -- I
15 said on -- in October of '18, I made a principal
16 payment of $2,000,000 back at the request of Think
17 Finance accelerating the note.  Three days later, they
18 declared bankruptcy, which was a surprise to me.
19          And then as part of the -- as part of the
20 renewed note, they asked to have the maturity date
21 shortened by one year as well.  So it went from 2021 to
22 2020.  And in 2020, the loans I had made had not
23 matured yet.  Some of the loans were outstanding.  I
24 couldn't call some of them.  We had lost some money.  I
25 was not able to pay it in full.  They sued me.  And as

---

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

093

KIMETRA BRICE, ET AL. vs KENNETH REES, ET AL.

**Attorneys Eyes Only**                    L. Steven Haynes on 02/12/2021                    **Pages 246..249**

Page 246

1  of last December 31st -- or 30th, I made the last
2  payment, and I've paid the loan off and settled that
3  issue.
4      Q.  (BY MS. HAAC)  Let me just show you, let's
5  see, Exhibit 174.  This is Think Finance, I think,
6  asking, "we have yet to see any investment detail on
7  the funds that are being invested on our behalf."  Is
8  that the $1,000,000?
9      A.  That would have been out of the first
10 payments, correct.
11     Q.  Okay.  Why was Think Finance wanting you to
12 invest funds on their behalf?
13     A.  They wanted -- the transaction was that --
14 that they and I would split the upside on the
15 investments 50/50.
16     Q.  I guess I'm just confused why -- I mean, was
17 it to kind of help you out since the contract was being
18 terminated?
19         MR. WITSCH:  Objection to the form.
20         THE WITNESS:  I -- I don't believe that
21 they were doing it to help me out.  But I don't know
22 the reason why they put off payment for five years.
23     Q.  (BY MS. HAAC)  Well, why did they let you take
24 $1,000,000 in the first place?
25         MR. WITSCH:  Objection to the form; calls

Page 247

1  for speculation.
2         THE WITNESS:  I never took $1,000,000.  It
3  was all part of this settlement with Plain Green paying
4  back to me $1,000,000 of the $5.2 million note which I
5  owed to Think Finance.  I owed a full $5.2 million.
6  They just -- they just made a initial installment
7  payment of a million and gave me a note of 4.2.  All of
8  that 5.2 was due to Think Finance.
9      Q.  (BY MS. HAAC)  No, I understand that.  I
10 just -- I'm just trying to understand why they didn't
11 take -- why Think Finance didn't take the $1,000,000 in
12 cash; why they wanted you to invest on their behalf?
13         MR. WITSCH:  Objection to the form.
14         THE WITNESS:  I don't know the answer.
15     Q.  (BY MS. HAAC)  Okay.  Let me show you what's
16 been marked as Exhibit 175, and this starts
17 Haynes0003246.  These are the interest payments -- or I
18 think these are the payments that you received under
19 the consulting agreement that you had with Think
20 Finance, right?
21         MR. WITSCH:  Objection to the form.
22         THE WITNESS:  This looks to be the first
23 payment that I got from the 1 percent, the first one.
24     Q.  (BY MS. HAAC)  Right.  And then if you go to
25 the end -- let's see -- I guess this is November 30th,

Page 248

1  2014.  That wouldn't be the last one?
2      A.  Close.
3         MR. WITSCH:  I'm sorry, Anna, which page
4  are you on?
5         MS. HAAC:  67.
6         MR. WITSCH:  Thank you.
7      Q.  (BY MS. HAAC)  And so you received -- this
8  shows your monthly payments that you received that
9  represented the 1 percent of the gross revenue of Plain
10 Green loans, right?
11     A.  That's correct.
12     Q.  Other than the 1 percent, what other
13 additional financial -- or I guess what other monetary
14 value did you receive by virtue of your relationship
15 with Think Finance?  Can you just walk me through every
16 bucket?
17     A.  By virtue of my relationship with Think
18 Finance?
19     Q.  Yes.
20     A.  It would have been the first two payments --
21 or the marketing payments of $10,000 from Plain Green.
22         I would have received some income from
23 Carmel Solutions for about six months or so; I'm
24 thinking 50 or $60,000 that HP Funding received.
25         And indirectly through -- through the

Page 249

1  Circle of Nations in Pinoleville, I am paid -- I
2  believe it's $13,000 a month.
3      Q.  Anything else?
4      A.  I can't think of anything else that I
5  received.
6      Q.  Let's see.  The promissory note that we just
7  talked about had said that you were paid a 2 percent
8  management fee.  Did you receive compensation relating
9  to the $5.2 million promissory note?
10     A.  I -- I received two payments.  But at the end,
11 with the settlement, it was not deducted from the full
12 note.
13         MR. WITSCH:  Anna, to the extent that that
14 question is calling for disclosure of settlement
15 communications, I don't think that Mr. Haynes is able
16 to disclose the terms of that confidential
17 settlement.
18         MS. HAAC:  Are you instructing him not to
19 answer?  Because I don't think you want to go into
20 another deposition.  I mean, come on.
21         MR. WITSCH:  Could we go off the record
22 for two minutes so that you and I could talk about
23 that?
24         MS. HAAC:  Well, we have nine minutes
25 before he needs to leave.

www.huseby.com                    **Huseby, Inc.  Regional Centers**                    800-333-2082
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

094

**KIMETRA BRICE, ET AL. vs KENNETH REES, ET AL.**

| Attorneys Eyes Only | L. Steven Haynes on 02/12/2021 | Pages 250..253 |

Page 250

1    MR. WITSCH:  I understand.
2    MS. HAAC:  Okay.
3    THE VIDEOGRAPHER:  Are we going off the
4  record?
5    MR. WITSCH:  Yes.
6    MS. HAAC:  Yes.
7    THE VIDEOGRAPHER:  Okay.  We're off the
8  record at 5:52 p.m.
9    (A recess was taken.)
10    THE VIDEOGRAPHER:  This is the beginning
11  of Media No. 7 in the deposition of L. Steven Haynes.
12  The time is 5:53 p.m.  We are back on the record.
13    MR. WITSCH:  All right.  So just to put on
14  the record the position Mr. Haynes is taking here.
15    The question called for him to speak about
16  a settlement agreement that's confidential.  And as I
17  explained to counsel for the plaintiffs, the options
18  that I think I have at the moment are to either adjourn
19  the deposition now or to adjourn the deposition -- or
20  to allow counsel to ask questions about unrelated
21  topics and then allow the deposition to be adjourned at
22  the conclusion.
23    And I understand we're only going to go
24  another four or five minutes, so I'd like to let
25  Ms. Haac use that time for, you know, any productive

Page 251

1  purpose she wants other than talking about the
2  confidential settlement.
3    But, you know, we're going to seek a
4  protective order in order to prevent Mr. Haynes from
5  having to disclose the terms of the settlement
6  agreement that he was speaking about.
7    Q.  (BY MS. HAAC)  So, just to be clear,
8  Mr. Haynes, the settlement agreement that you're
9  talking about is relating to the management fee and
10  promissory note that we were discussing, right?
11    A.  Correct.
12    Q.  Okay.  And so other than that bucket -- I'm
13  sorry, and who's the -- who was the agreement with?
14    MR. WITSCH:  Mr. Haynes, I think maybe we
15  should -- if that information itself is confidential --
16  and I don't know one way or the other whether it is --
17  if it is, it should be the subject of our motion.  If
18  not -- if it's not a confidential -- if it's not
19  confidential who the parties to the agreement are, then
20  you can answer that.
21    THE WITNESS:  I don't know how broad that
22  confidentiality --
23    MR. WITSCH:  Yeah.  Ms. Haac, I think this
24  might be best dealt with later.
25    Q.  (BY MS. HAAC)  Okay.  So that bucket -- so

Page 252

1  right now in terms of the bucket of money that you --
2  different buckets of money that you've made in
3  connection with your work, directly or indirectly, with
4  Think Finance, you've told me about the 1 percent of
5  fees -- I'm sorry, the 1 percent of Plain Green's gross
6  revenue, correct?
7    A.  Correct.
8    Q.  The marketing payments that you received from
9  Plain Green in the amount of $10,000, correct?
10    A.  Correct.
11    Q.  And just to circle back, the 1 percent of
12  revenue, to the best of your recollection, was around
13  7,000,000, right?
14    A.  Gross payments to me, yes.  I had a partner
15  that I paid half of everything to.
16    Q.  And then the third bucket is income that you
17  received from Carmel Solutions relating to your ACH
18  processing work that you did on behalf of Think
19  Finance; is that right?
20    A.  That I did on behalf of Plain Green; but, yes,
21  Think Finance, yes.
22    Q.  And you received, you think, about 50 to
23  $60,000?
24    A.  I have to look at the -- between then and the
25  -- between the signing of it and the termination of the

Page 253

1  Think agreement, yes, I believe that's correct.
2    Q.  And is that why you believe that no other
3  banking relationships or ACH processing relationships
4  came to fruition with Think Finance, because you didn't
5  receive any additional fees?
6    MR. WITSCH:  Objection to the form.
7    THE WITNESS:  It's one of the reasons,
8  yes.
9    Q.  (BY MS. HAAC)  And then the Circle of Nations
10  bucket of payment, which is 13,000 a month, correct?
11    A.  That's correct.
12    Q.  And then the 2 percent -- the settlement
13  agreement and payments relating to that pertaining to
14  the promissory note that we were discussing, right?
15    A.  That's correct.
16    Q.  Which you can't disclose any details of?
17    A.  Correct.
18    Q.  Upon instruction of your counsel.
19    Are there any other buckets of income or
20  monetary value you received as a result of your work,
21  indirectly or directly, with Think Finance?
22    A.  I can't think of any others.
23    Q.  I don't believe that I have any other
24  questions.  And I know we are running on time, so I
25  want to -- let me just do this really quickly.  Just

**KIMETRA BRICE, ET AL. vs KENNETH REES, ET AL.**
**Attorneys Eyes Only**      L. Steven Haynes on 02/12/2021      **Pages 254..257**

---

**Page 254**

1  give me two minutes.
2              Let me just ask.  Let me just do this
3  really quickly.  I'm sorry.  I'll do this one last
4  exhibit.  It's Exhibit 176, and it's GPLP00081914.  Let
5  me show you Page 3 of this email.  It's an email from
6  Terence Dunleavy to Chad Peterson.  And he says, "Chad,
7  as requested below please find an explanation of the
8  opportunity.  Please let me know your thoughts."  I
9  believe this is -- the kind of statement that follows
10  was written by you; is that right?
11      A.  I believe that's correct, yes.
12      MS. HAAC:  Okay.  All right.  Then I don't
13  have any other further questions.
14              I would say enjoy your night, but you're
15  going to do a COVID test, so I can't say that,
16  Mr. Haynes.  But I appreciate you bearing with me and
17  being present.
18              And, Michael, do you have any other?
19      MR. WITSCH:  Not on the record, although,
20  I just -- I suppose I should state that we'll read and
21  sign.  And with that, I don't think we have anything
22  else to do.
23      MS. HAAC:  Yeah, I guess at this point,
24  the deposition is staying open just by virtue of the
25  issue that we identified relating to the

---

**Page 255**

1  confidentiality of the settlement we discussed.
2      MR. WITSCH:  Right.  And we'll designate
3  the transcript confidential pending the outcome of the
4  protective order.
5              And, Trashuna, I apologize for this, but
6  because of the need to do this protective order motion,
7  you know, we're going to need the transcript on an
8  expedited return, please.
9      MS. HAAC:  All right.  And we can talk
10  about this, too, Michael if you want, you know, next
11  week, so we can determine what -- you know, maybe it
12  makes sense to talk a bit off the record.
13      MR. WITSCH:  Yeah, I was going to say if
14  you're -- if you're concluded, I don't have any
15  questions for the witness, so why don't we go off the
16  record and let him go.
17      MS. HAAC:  Yeah.
18      THE VIDEOGRAPHER:  We're off the record at
19  6:00 p.m.
20      (A break was taken.)
21      (On the record at 6:04 p.m.)
22      (Witness not present.)
23      MS. HAAC:  Okay.  So I just wanted to be
24  clear that counsel for Mr. Haynes, prior to going off
25  the record, designated everything in the deposition as

---

**Page 256**

1  confidential.  I think that pursuant to the protective
2  order, the specific testimony that's confidential is
3  supposed to be designated.
4              I don't see a basis for designating the
5  entirety of the deposition testimony confidential,
6  particularly given that Judge Orrick has ordered
7  unsealed the majority, if not all, of the deposition
8  exhibits that we introduced here over the objection of
9  counsel.
10              And so I'm just going to put on the record
11  that I'd ask counsel, pursuant to the protective order,
12  to designate on the record what testimony specifically
13  he believes needs to be designated as confidential.
14      MR. WITSCH:  And this is Michael Witsch
15  for Mr. Haynes.
16              I will accept Ms. Haac's representation of
17  the content of the protective order.  The portions of
18  the deposition that we would designate confidential
19  would be those dealing with the settlement agreement
20  that would be the subject of the protective order.
21      MS. HAAC:  So just the stuff that you
22  instructed him not to answer?
23      MR. WITSCH:  For present purposes,
24  that's -- I'm only speaking about the settlement
25  issue.

---

**Page 257**

1      MS. HAAC:  Okay.  And then you can get
2  back to us in writing whether you're going to
3  de-designate that part of the record once you get the
4  written transcript?
5      MS. HAAC:  Yeah, we haven't seen the
6  transcript yet, but we'll write to you.
7      MS. HAAC:  Okay.
8      (Off the record at 6:06 p.m.)
9      (Deposition concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

CAUSE NO. DC-19-13904

| | | |
|---|---|---|
| THINK FINANCE, LLC, | § | IN THE DISTRICT COURT |
|     *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| L. STEVEN HAYNES d/b/a/HAYNES | § | |
| INVESTMENTS, INC., HAYNES | § | |
| INVESTMENTS, LLC, H&R WHOLESALE, | § | |
| LLC, f/k/a RJK VENDING FUNDING, LLC, | § | |
| REDLICH INVESTMENTS, LLC, SRILLS, LLC, | § | 160th JUDICIAL DISTRICT |
| JEREMY ROUNSVILLE, SAFEDECIDE, LLC, | § | |
| SRILLS TECHNOLOGY, LLC, TANGENT | § | |
| GAMING TX, LLC f/k/a YNS SERVICES LLC, | § | |
| YNS GENERAL CONTRACTORS, LLC, YNS | § | |
| INVESTMENTS, LP, YVONNE HOPEN, a/k/a | § | |
| YVONNE HOPPEN, SAAH MANAGEMENT | § | |
| SERVICES, LLC, N73CL, LLC, 2H LENDING | § | |
| MANAGEMENT SERVICES, LLC, JOHN | § | |
| DAUGOMAH, CSB ENTERPRISES, LLC, | § | |
|     *Defendants.* | § | DALLAS COUNTY, TEXAS |

**ORDER GRANTING**
**JOINT MOTION TO ABATE PROCEEDINGS PENDING SETTLEMENT**

The Court, having considered the Joint Motion to Abate Proceedings Pending

Settlement ("Motion to Abate") filed by Plaintiff Think Finance, LLC, and Defendants,

L. Steven Haynes, Haynes Investments, LLC, H&R Wholesale, LLC, Redlich

Investments, LLC, Srills, LLC, Safedecide, LLC, Srills Technology, LLC, Tangent

Gaming TX, LLC, YNS Services, LLC, YNS General Contractors, LLC, YNS Investments,

LP, Yvonne Hopen, SAAH Management Services, LLC, N73CL, LLC, 2H Lending

Management Services, LLC, John Daugomah, and CSB Enterprises, LLC, finds that the

1

DEFENDANT'S EXHIBIT

**6**

Motion to Abate is meritorious and should be granted. It is therefore

ORDERED that the Joint Motion to Abate Proceedings Pending Settlement is

hereby GRANTED, and all proceedings in this case shall be ABATED until March 30,

2021, unless and until the court is notified by written motion that the abatement should

be lifted and the case reinstated or that the case should be dismissed with prejudice.

SIGNED this 26th day of August, 2020.

Judge Aiesha Redmond
160th Judicial District Court
Harris County, Texas

APPROVED AS TO FORM:

By: /s/ John M. Frick
    John M. Frick
    Texas Bar No. 07455200
    jfrick@bennettweston.com
    Bennett, Weston, LaJone, &
    Turner, P.C.
    1603 LBJ Freeway, Suite 280
    Dallas, Texas 75234
    Tel. (972) 662-4901
    Fax (214) 393-4043
    *Counsel for Think Finance, LLC*

By: /s/ David A. Walton
    David A. Walton
    Texas Bar No. 24042120
    dwalton@bellnunnally.com
    Bell Nunnally & Martin LLP
    2323 Ross Avenue, Suite 1900
    Dallas, Texas 75201
    Tel. (214) 740-1445
    Fax (214) 740-5745
    *Counsel for Defendants*

2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Debbie Archer on behalf of David Walton
Bar No. 24042120
debbiea@bellnunnally.com
Envelope ID: 45572720
Status as of 8/21/2020 10:22 AM CST

Associated Case Party: THINK FINANCE, L.L.C.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Taylor Wilson | | twilson@bennettweston.com | 8/20/2020 5:47:50 PM | SENT |
| John MichaelFrick | | jfrick@bennettweston.com | 8/20/2020 5:47:50 PM | SENT |

Associated Case Party: L.STEVENHAYNES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Debbie Archer | | darcher@bellnunnally.com | 8/20/2020 5:47:50 PM | SENT |
| Alissa Green | | agreen@bellnunnally.com | 8/20/2020 5:47:50 PM | SENT |
| David A.Walton | | dwalton@bellnunnally.com | 8/20/2020 5:47:50 PM | SENT |
| Mason G.Jones | | mjones@bellnunnally.com | 8/20/2020 5:47:50 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David Walton | | dwalton@bellnunnally.com | 8/20/2020 5:47:50 PM | SENT |
| Anthony Begon | | abegon@bellnunnally.com | 8/20/2020 5:47:50 PM | SENT |
| Susan Shores | | sshores@bellnunnally.com | 8/20/2020 5:47:50 PM | SENT |

Civil Case Cover Sheet
In The District Court
of Dallas County, Texas

August 31, 2020

ANTHONY J BEGON
BELL NUNNALLY & MARTIN LLP
2323 ROSS AVE
STE 1900
DALLAS TX 75201

IN RE: DC-19-13904
THINK FINANCE, L.L.C. vs. L. STEVEN HAYNES d/b/a HAYNES INVESTMENT, INC., et al

PLEASE SEE ATTACHMENT(S): ORDER ABATE

Attorneys update your information at:
https://www.dallascounty.org/government/district-clerk/attorney-form.php

JOHN MICHAEL FRICK
BENNETT WESTON LAJONE &
TURNER PC
1603 LBJ FREEWAY
SUITE 280
DALLAS TX 75234
ANTHONY J BEGON
BELL NUNNALLY & MARTIN LLP
2323 ROSS AVE
STE 1900
DALLAS TX 75201
DAVID A WALTON
BELL NUNNALLY & MARTIN LLP
2323 ROSS AVE SUITE 1900
DALLAS TX 75201
RANDY HOWRY
HOWRY BREEN & HERMAN LLP
1900 PEARL STREET
AUSTIN       TX 78705

100

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| KIMETRA BRICE, EARL BROWNE, and | § | |
| JILL NOVOROT, | § | |
| *Plaintiffs*, | § | MISC. ACTION NO. _____ |
| | § | |
| v. | § | (Relates to Case No. 3:18-cv-1200- |
| | § | WHO, in the United States District |
| HAYNES INVESTMENTS, LLC, and L. | § | Court, Northern District of California) |
| STEVEN HAYNES, | § | |
| *Defendants*. | § | |

## DECLARATION OF L. STEVEN HAYNES IN SUPPORT OF
## <u>MOTION FOR PROTECTION</u>

I, L. Steven Haynes, hereby declare, pursuant to 28 U.S.C. § 1746, that the

following statements are true and correct, to the best of my knowledge and belief, after

due inquiry described herein.

1. I am a resident of Dallas, Texas.

2. I am a party in the matter known as Case No. 3:18-cv-1200-WHO, *Kimetra*

*Brice et al. v. Haynes Investments, LLC, et al.*, pending in the United States District Court

for the Northern District of California (the "<u>California Lawsuit</u>").

3. I am also one of the many defendants in the matter known as Cause No.

DC-19-13904, *Think Finance, LLC v. L. Steven Haynes, et al.*, pending in the 160th Judicial

District Court of Dallas County, Texas (the "<u>Texas State Court Lawsuit</u>").

4. The parties in the Texas State Court Lawsuit privately and mutually

negotiated and entered into a confidential settlement and release agreement, effective

1

**DEFENDANT'S EXHIBIT**

**7**

101

August 7, 2020, resolving all disputes and controversies in the Texas State Court Lawsuit (the "Settlement Agreement").

5.      As part of the Settlement Agreement, the parties mutually and expressly agreed that they would maintain the terms of the settlement and the reasons therefore as strictly confidential, and that no party would disclose, share, or publish in any manner that information to any third party at any time unless required to do so by process of law.

6.      The confidentiality provision is a material term in the Settlement Agreement without which me or the other defendants would not have been willing to enter into the Settlement Agreement, and it remains material to me and the other defendants to maintain the confidentiality of the Settlement Agreement.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: March 4, 2021            _____

                                L. Steven Haynes

**Michael Witsch**

| | |
|---|---|
| **From:** | Anna C. Haac <ahaac@tzlegal.com> |
| **Sent:** | Thursday, March 04, 2021 3:23 PM |
| **To:** | Michael Witsch |
| **Cc:** | Andrew Guzzo; Jon Boughrum; Leonard Bennett; Mallory Morales |
| **Subject:** | RE: Haynes deposition follow-up [IWOV-IDOCS.FID3386122] |

Thanks for letting us know Michael.

**Anna C. Haac** ▪ Tycko & Zavareei LLP ▪ www.tzlegal.com
1828 L Street, NW ▪ Suite 1000 ▪ Washington, DC 20036
p 202.973.0900 x 105 ▪ f 202.973.0950

*\*This message is sent from a cellular device and as a result, may have inadvertent spelling or grammatical errors. The message is for the exclusive use of the addressee and contains confidential, privileged and non-disclosable information.  If the recipient of this message is not the addressee, or a person responsible for delivering the message to the addressee, the recipient is prohibited from reading or using this message in any way.  If you have received this message by mistake, please call us immediately and destroy the email message.*

**From:** Michael Witsch <MWitsch@atllp.com>
**Sent:** Thursday, March 4, 2021 3:04 PM
**To:** Anna C. Haac <ahaac@tzlegal.com>
**Cc:** Andrew Guzzo <aguzzo@kellyguzzo.com>; Jon Boughrum <JBoughrum@atllp.com>; Leonard Bennett <lenbennett@clalegal.com>
**Subject:** RE: Haynes deposition follow-up [IWOV-IDOCS.FID3386122]

Anna,

Haynes's motion for a protective order with respect to the confidential terms of the Texas settlement agreement about which Plaintiffs wish to inquire should be filed today—we are just waiting on a signature.

Upon review of the deposition transcript, we have determined that the portions designated confidential do not need to retain that designation, so you may consider the designation withdrawn.

Thank you,
Mike

 Armstrong Teasdale

Armstrong Teasdale LLP
**Michael C. Witsch** | Partner
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
DIRECT: 267.780.2016 | FAX: 215.405.9070
mwitsch@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.


DEFENDANT'S
EXHIBIT
**8**
_____

**103**

**From:** Michael Witsch
**Sent:** Friday, February 26, 2021 1:48 PM
**To:** 'Anna C. Haac'
**Cc:** Andrew Guzzo; Jon Boughrum; Leonard Bennett
**Subject:** RE: Haynes deposition follow-up [IWOV-IDOCS.FID3386122]

Fair enough. I'm away from the office and travelling through Sunday, but we'll file the motion next week in that case. The transcript arrived yesterday.

Thanks,
Mike

 Armstrong Teasdale

Armstrong Teasdale LLP
**Michael C. Witsch** | Partner
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
DIRECT: 267.780.2016 | FAX: 215.405.9070
mwitsch@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

---

**From:** Anna C. Haac [mailto:ahaac@tzlegal.com]
**Sent:** Friday, February 26, 2021 1:26 PM
**To:** Michael Witsch
**Cc:** Andrew Guzzo; Jon Boughrum; Leonard Bennett
**Subject:** RE: Haynes deposition follow-up [IWOV-IDOCS.FID3386122]

Mike,

Didn't realize that about the transcript. We do want to inquire further about the note, so expect that you will be filing a protective order. Please let us know your ETA on this.

Thanks,
Anna

**Anna C. Haac** ▪ Tycko & Zavareei LLP ▪ www.tzlegal.com
1828 L Street, NW ▪ Suite 1000 ▪ Washington, DC 20036
p 202.973.0900 x 105 ▪ f 202.973.0950

*This message is sent from a cellular device and as a result, may have inadvertent spelling or grammatical errors. The message is for the exclusive use of the addressee and contains confidential, privileged and non-disclosable information.  If the recipient of this message is not the addressee, or a person responsible for delivering the message to the addressee, the recipient is prohibited from reading or using this message in any way.  If you have received this message by mistake, please call us immediately and destroy the email message.*

**From:** Michael Witsch <MWitsch@atllp.com>
**Sent:** Tuesday, February 23, 2021 8:45 AM
**To:** Anna C. Haac <ahaac@tzlegal.com>
**Cc:** Andrew Guzzo <aguzzo@kellyguzzo.com>; Jon Boughrum <JBoughrum@atllp.com>
**Subject:** RE: Haynes deposition follow-up [IWOV-IDOCS.FID3386122]

Hi Anna,

I recall that we left it at you were going to caucus on your side about whether Plaintiffs intended/needed to pursue that line of questioning further and circle back about whether a motion would be necessary. What was the outcome of that dialogue?

We're otherwise waiting on the transcript. Although we requested it be expedited, the reporter is in Texas and was without power for much of the time since the deposition because of the storms there. If you say we need to, we can file the motion shortly after we have the transcript. My hope is that won't be necessary, but please let us know.

Thanks,
Mike



Armstrong Teasdale LLP
**Michael C. Witsch** | Partner
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
DIRECT: 267.780.2016 | FAX: 215.405.9070
mwitsch@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

---

**From:** Anna C. Haac [mailto:ahaac@tzlegal.com]
**Sent:** Tuesday, February 23, 2021 1:18 AM
**To:** Jon Boughrum
**Cc:** Michael Witsch; Andrew Guzzo
**Subject:** RE: Haynes deposition follow-up

**CAUTION:**   **EXTERNAL EMAIL**

Yes, please provide the documents. Also, Michael stated that he was going to file a protective order because he instructed Haynes not to answer questions relating to Think finance's $4 million note. Can you please provide the status on that.

**Anna C. Haac** ▪ Tycko & Zavareei LLP ▪ www.tzlegal.com
1828 L Street, NW ▪ Suite 1000 ▪ Washington, DC 20036
p 202.973.0900 x 105 ▪ f 202.973.0950

*This message is sent from a cellular device and as a result, may have inadvertent spelling or grammatical errors. The message is for the exclusive use of the addressee and contains confidential, privileged and non-disclosable information. If the recipient of this message is not the addressee, or a person responsible for delivering the message to the addressee, the recipient is prohibited from reading or using this message in any way. If you have received this message by mistake, please call us immediately and destroy the email message.*

---

**From:** Jon Boughrum <JBoughrum@atllp.com>
**Sent:** Monday, February 22, 2021 10:20 AM
**To:** Anna C. Haac <ahaac@tzlegal.com>
**Cc:** Michael Witsch <MWitsch@atllp.com>
**Subject:** Haynes deposition follow-up

Anna,

I understand that during your deposition of Steven Haynes you asked about certain Pepper Hamilton memos. We've looked into this subject and found that one of the memos was produced by Haynes in discovery (see attached document). The other memos were part of the group of documents we believed were protected by Plain Green's attorney-client privilege with Pepper Hamilton and which we withheld from production and gave to Plain Green's counsel to assert a privilege objection. Based on my e-mails, it looks like Andrew and I had an e-mail exchange on November 5, 2019 in which I said I was free to discuss the Plain Green privileged documents and Andrew said he would call me the following day. I don't have any notes which suggest that Andrew ever called me to discuss the documents. Regardless, Plain Green's counsel has confirmed to me that they no longer wish to assert privilege over the documents so I can produce them to you if plaintiffs still want the documents (I presume you do, but please confirm).

Thanks,



Armstrong Teasdale LLP
**Jonathan P. Boughrum** | Partner
2005 Market St., 29th Floor, One Commerce Square
Philadelphia, PA 19103
DIRECT: 267.780.2012 | FAX: 215.405.9070
jboughrum@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

**\*\*\*\*\*\*\*\*\*\* PRIVATE AND CONFIDENTIAL\*\*\*\*\*\*\*\*\*\***

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

**Michael Witsch**

| | |
|---|---|
| **From:** | Trashuna Salaam <trashuna.salaam@gmail.com> |
| **Sent:** | Wednesday, February 17, 2021 7:58 PM |
| **To:** | Michael Witsch |
| **Cc:** | transcripts@huseby.com; Stephani Catapano |
| **Subject:** | Rough Draft Transcript_Stephen Haynes_Deposition 02-12-21 |
| **Attachments:** | Stephen Haynes Deposition - 02-12-21 - Rough Draft.pdf |

**CAUTION:** **EXTERNAL EMAIL**

Good evening,

Please find the above-referenced rough draft deposition transcript attached to this email.

I apologize that I wasn't able to send this out sooner, but we have been dealing with severe power outages here in Texas; and we just got power back at our house today.  I truly appreciate your patience and understanding as I work my hardest to get the final certified transcript out as soon as I can.

If you have any questions or concerns, please do not hesitate to contact me.

Best regards,



*Trashuna Salaam*
**Texas Certified Shorthand Reporter**
**817.692.9067**



107